LENA A. HUMPHREY, administratrix,[1] *vs.* FLORENCE BYRON
& others.[2]

Plymouth. December 5, 2005. - July 21, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Landlord and Tenant,* Duty to repair, Landlord's liabilities to tenant or one
having his rights, Control of premises. *Nuisance. Real Property,* Nuisance.

This court declined to extend to commercial landlords a duty to exercise
reasonable care to assure that others legitimately on leased premises were
not subject to an unreasonable risk of harm. [325-328]

A landlord was not liable in an action for negligence arising from a fall that
occurred on leased commercial property, where the landlord did not
contract to make repairs and the defect that caused the injury was not in a
common area or other area appurtenant to the leased area, and where the
record did not suggest that the landlord retained control over the premises.
[328-331]

A fall that occurred on stairs located on leased commercial property did not
give rise to a claim of nuisance, where there was no evidence that the
landlord, by permitting the stairs to remain in their defective condition,
interfered with the victim's use and enjoyment of any other property in
which he had an interest, or that the stairs interfered with the exercise of a
public right by directly encroaching on public property or by causing a
common injury. [331-332]

CIVIL ACTION commenced in the Superior Court Department on
October 22, 2002.

The case was heard by *Paul E. Troy,* J., on a motion for sum-
mary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*Joseph C. Borsellino (Neil D. Schnurbach* with him) for the
plaintiff.

---

[1]Of the estate of Robert Humphrey. After commencing this action, Hum-
phrey died intestate of unrelated causes. Lena Humphrey, Humphrey's mother
and the administratrix of his estate, was substituted as the plaintiff and is
prosecuting this appeal. For ease of reference we shall refer to Robert Hum-
phrey as the plaintiff.

[2]Joanne Byron and Byron & Byron.

*Thomas R. Murphy* for the defendants.

The following submitted briefs for amici curiae:

*Christopher A. Kenney & Edward S. Cheng* for Massachusetts Defense Lawyers Association.

*Andrew R. Grainger, Martin J. Newhouse, & Ben Robbins* for New England Legal Foundation & another.

*Patrick T. Jones & J. Michael Conley* for Massachusetts Academy of Trial Attorneys.

CORDY, J. "In *Young* v. *Garwacki*, 380 Mass. 162 (1980), we held that, even in the absence of an express agreement to keep rented premises in repair, a lessor of residential premises had a duty to exercise reasonable care to assure that others legitimately on the leased premises were not subject to an unreasonable risk of harm. If such a lessor knew or should have known of a defect, the lessor would be liable for injuries resulting from the lessor's negligent maintenance of areas rented to the lessee." *Chausse* v. *Coz*, 405 Mass. 264, 266 (1989). In imposing this duty on residential landlords, we explicitly reserved the question whether a similar duty should extend to lessors of nonresidential properties. *Young* v. *Garwacki*, *supra* at 171 n.12. In subsequent cases, we have done the same. See *Chausse* v. *Coz*, *supra*, and cases cited. In the present case, we are again asked to impose that duty on commercial landlords, or at least on those landlords who rent space to small businesses.[3] A Superior Court judge allowed the defendants' motion for summary judgment, and the plaintiff appealed. We granted a joint application for direct appellate review. We decline to impose such a duty and affirm the grant of summary judgment.

1. *Background.* For purposes of summary judgment, the following facts were before the judge. Robert Humphrey (Humphrey) worked for Gateway Graphics and Awards, Inc. (Gateway), a silkscreen printing company. The company operated out of a building in Wareham, leased to it by the defendants Florence Byron and Joanne Byron, sisters who occasionally

---

[3]The court solicited amicus briefs on this question, and we acknowledge the briefs of the Massachusetts Defense Lawyers Association; the Massachusetts Academy of Trial Attorneys; and the New England Legal Foundation and the Massachusetts Chapter of the National Association of Industrial and Office Properties.

operate as Byron & Byron (landlord). In January, 2000, Humphrey was injured in a fall while working in the building.

The principals of Gateway were Michael Humphrey (Humphrey's brother) and a partner. Its business operations commenced on the purchase of Cape Cod Seriagraphics (Seriagraphics) in November, 1998. At the time of the purchase, Seriagraphics was located in the leased premises. Following its acquisition of Seriagraphics, Gateway executed a new lease with the landlord.

The lease was for a one-year term.[4] It consisted of a pre-printed form with substantial handwritten modifications and additions. The modifications and additions reflected, in part, negotiations between Gateway, which was represented by counsel, and the landlord, which was not. For example, the rent was negotiated down from $1,000 per month to $888.88 per month. The lease provided that Gateway would have "exclusive control of the leased premises," which was the entire building, and the obligation to maintain, at its own expense, "both outside and inside" of the same. The lease also provided that "additions, repairs, alterations, or structural changes" that the lessee wished to make could only be done with the lessor's approval, and that the lessor could, at reasonable times, enter the premises and make "repairs and alterations compatible with the lessee's use of premises." The leased premises included the basement and the stairs leading down to it from the first floor.[5] The stairs had no railing, were wobbly, and had low ceiling clearance. It was from these stairs that Humphrey fell in January, 2000.

At the time of his accident, Humphrey was Gateway's only employee. He was descending the stairs, as he had done regularly for at least the past fifteen months, to retrieve stock or tools stored in the basement. The injury he sustained in the fall was principally to his right hand, and resulted in numerous surgeries and the loss of most of its use. He qualified for and received workers' compensation benefits.

---

[4]While the lease covered January 1, through December 31, 1999, the occupancy continued (and the accident occurred) after the lease expired. The parties, however, do not dispute that the terms of the lease remained in effect.

[5]There was evidence that Florence Byron continued to store furniture in the basement and had on at least two occasions in fifteen months entered to remove some of the items.

Humphrey brought suit against the landlord in October, 2002, claiming that it had a duty to maintain the leased premises; knew or should have known that the stairs were defective and created an unreasonable danger of falling; and were negligent in maintaining the premises, thereby creating a dangerous condition and allowing it to exist for an unreasonable period of time. After discovery concluded, the landlord moved for summary judgment.

After considering three separate bases for liability argued by Humphrey, the judge granted summary judgment to the landlord. The judge first declined to extend the duty we announced in *Young* v. *Garwacki, supra,* to commercial landlords, and to impose on such landlords the duty to maintain a leased premises beyond what they might agree to undertake under the terms of the lease. The judge next rejected the argument that the landlord maintained sufficient control of the basement area to impose on the landlord, as a matter of law, a duty to maintain that area. Finally, the judge concluded that the landlord was not liable for injuries to third persons caused by an alleged "nuisance" (the defective stairs) that preexisted the lease to Gateway, see *Whalen* v. *Shivek,* 326 Mass. 142, 153-154 (1950), because such liability (to the extent a nuisance existed at all) was limited to personal injuries incurred outside of the leased premises, such as those sustained by a pedestrian from falling bricks or large stone blocks.

2. *Standard of review.* "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Anderson St. Assocs.* v. *Boston,* 442 Mass. 812, 816 (2004), quoting *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991). See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). The moving party may prevail by showing that the nonmoving party has no reasonable expectation of proving an essential element of his case at trial. *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991). We review the judge's decision in light of this standard, and as explained below, we agree with his conclusions.

3. *Duty of commercial landlord.* Prior to our *Young* decision,

Massachusetts adhered to the common-law rule of let the lessee beware: "The tenant took the premises as he found them." *Young* v. *Garwacki, supra* at 165, citing *Gade* v. *National Creamery Co.*, 324 Mass. 515, 518 (1949). "[D]uring the term of the rental, 'there could be no tort liability for nonfeasance in the absence of an agreement, for consideration, that the landlord would keep the premises in a condition of safety, and make all repairs without notice.' " *Young* v. *Garwacki, supra* at 166, quoting *DiMarzo* v. *S. & P. Realty Corp.*, 364 Mass. 510, 513 (1974). As to residential tenancies, we did away with this "ancient law," *Young* v. *Garwacki, supra* at 168, and adopted the rule that "landlords as other persons must exercise reasonable care not to subject others to an unreasonable risk of harm. A landlord must act as a reasonable person under all of the circumstances including the likelihood of injury to others, the probable seriousness of such injuries, and the burden of reducing or avoiding the risk." *Young* v. *Garwacki, supra* at 169, quoting *Sargent* v. *Ross*, 113 N.H. 388, 397-398 (1973). Humphrey urges us to extend this rule to commercial landlords.

Our *Young* decision was rooted largely in the gradual departure from the common-law agrarian model of leases, which regarded a lease as a conveyance of property. *Young* v. *Garwacki, supra* at 164-165. In the residential context, "we have overthrown the doctrine of caveat emptor and the notion that a lease is a conveyance of property." *Id.* at 168. Similarly, in the commercial context, we have recognized that the notion of a lease as a conveyance "no longer comports with the reality of the typical modern commercial lease, which is intended to secure the right to occupy improvements to the land rather than the land itself, and which usually contemplates a continuing flow of necessary services from landlord to tenant, services that are normally under the landlord's control." *Wesson* v. *Leone Enters., Inc.*, 437 Mass. 708, 720 (2002), citing 1 M.R. Friedman, Leases § 1.1 (4th ed. 1997). The modern trend is to regard leases not "as 'conveyances,' [but] as contracts for the possession of property." *Wesson* v. *Leone Enters., Inc., supra* at 717.

Nonetheless, "we continue to recognize that there are significant differences between commercial and residential tenancies and the policy considerations appropriate to each."

*Wesson* v. *Leone Enters., Inc., supra* at 719. As we have said in other contexts, "the bargaining power of commercial tenants at the lease drafting stage is ordinarily greater than that of residential tenants," *21 Merchants Row Corp.* v. *Merchants Row, Inc.,* 412 Mass. 204, 207 (1992), and "[c]ommercial tenants tend to be more sophisticated about the terms of their leases and, unlike residential tenants, commercial tenants generally purchase liability insurance." *Seaco Ins. Co.* v. *Barbosa,* 435 Mass. 772, 778 (2002). For those reasons, we stated that "logic would dictate that, if we were to differentiate between residential and commercial leases, we would do so in favor of residential rather than commercial tenants," *21 Merchants Row Corp.* v. *Merchants Row, Inc., supra* (commercial landlord may unreasonably refuse consent to assignment of lease; no greater protection for commercial tenants than for residential tenants), and we declined to extend the rule protecting residential tenants in *Peterson* v. *Silva,* 428 Mass. 751 (1999) (absent contrary express provision in lease, residential tenant deemed to be coinsured under landlord's fire insurance policy), to commercial tenants. *Seaco Ins. Co.* v. *Barbosa, supra* at 777-779. We have also recognized that "modern notions of consumer protection" have played a role in the development of the law regarding residential leases, and in particular in the emergence of "the almost universally recognized warranty of habitability implied in residential leases."[6] *Wesson* v. *Leone Enters., Inc., supra* at 717, 718. Such notions of consumer protection have no applicability to dealings between businesses. In view of the significant differences between residential and commercial tenancies, we decline to extend *Young* v. *Garwacki, supra.*

Humphrey also argues that even if we do not extend the *Young* rule to commercial tenancies as a general matter, we

---

[6]The question whether a commercial lease contains any implied warranty analogous to the implied warranty of habitability is not before this court. The parties' submissions below did not raise the issue of an implied warranty, but concerned only Humphrey's claims of negligence.

Similarly, Humphrey does not contend that the landlord had any duty to repair defects under G. L. c. 186, § 19, and there is no evidence that the landlord received written notice of an unsafe condition as required by that statute. We thus need not decide whether that statute imposes a duty on commercial as well as residential landlords.

should nonetheless do so where the tenant is a small business with "a short-term lease, limited funds, and limited experience dealing with such defects." *Young* v. *Garwacki, supra* at 168 (characterizing residential tenants). While we doubt that such a rule would be workable given the huge variety of businesses that enter into commercial leases, we need not decide the question on this record. We said in the *Young* case that a residential tenant, because of those characteristics, lacked an incentive "to pay for expensive work on a place he will soon be leaving." *Id.* Under the common-law rule, neither the landlord nor the tenant had any incentive to repair defects, and as a result, they would likely go unrepaired. *Id.* at 168-169. The record does not suggest that the same danger exists in commercial tenancies. Even a small commercial tenant such as Gateway would have an incentive to make repairs, for example, to avoid workers' compensation claims and to maintain an orderly and productive business without injuries to employees or customers. A small commercial tenant, unlike a residential tenant, could also regard repair expenses as a cost of doing business and raise prices accordingly.[7] Nothing in the record suggests that Gateway's small size left it without an incentive to pay for repairs.

Further, Humphrey cannot show that Gateway's small size deprived it of bargaining power in negotiating the allocation of responsibilities under the lease. Gateway, with its two officers, was small, but no smaller than the landlord's informal partnership. Gateway was represented by counsel, unlike the landlord, and was able to negotiate a reduction in rent.[8] In these circumstances, Humphrey cannot show that Gateway was at any disadvantage that would warrant the imposition of liability on the landlord.

4. *Control over premises.* Our decision today leaves intact the rule that "a lessor of commercial premises is liable in tort for personal injuries only if either (1) he contracted to make repairs and made them negligently, or (2) the defect that caused the

---

[7]Conversely, imposing liability on commercial landlords would most likely fail to protect small businesses from the costs of repairs, as landlords could simply pass such costs to their tenants by increasing rents.

[8]At her deposition, Florence Byron could not explain what accounted for the reduced rent, other than "[g]ood will maybe." She did not recall any specific reason, such as any concession offered by Gateway.

injury was in a 'common area,' or other area appurtenant to the leased area, over which the lessor had some control." *Chausse* v. *Coz*, 405 Mass. 264, 266 (1989). There is no suggestion that the landlord contracted to make repairs. As the lease plainly shows, the parties to the lease agreed that Gateway would have this responsibility. Humphrey argues, however, that liability should be imposed on the landlord because it retained control over the premises. Even viewed in the light most favorable to Humphrey, the record does not support such a conclusion.

As the *Chausse* language suggests, Massachusetts case law recognizes a distinction between the leased premises themselves and "common" or "appurtenant" areas outside the leased premises, such that ordinarily, the tenant is responsible for the leased premises and the landlord, perhaps jointly with the tenant, is responsible for common or appurtenant areas. See, e.g., *Tuchinsky* v. *Beacon Prop. Mgt. Corp.*, 45 Mass. App. Ct. 469, 470 (1998) ("By designation in the lease, the elevator lobby [where the accident occurred] was part of the leased premises. It was not common area and was not used by anyone except [the commercial tenant] and its invitees. . . . The allegedly unsafe door was not in a common area. It was *within* the leased area, and it was not in an area *appurtenant* to the leased area" [emphasis in original]; landlord of multitenant commercial building not liable for injury to tenant's employee); *Monterosso* v. *Gaudette*, 8 Mass. App. Ct. 93, 97-100, 102 (1979) (commercial landlord and one tenant in multitenant building not entitled to directed verdicts on negligence claims; evidence warranted findings that both landlord and tenant exercised control over appurtenant area where accident occurred). Gateway leased the entire building from the landlord, including the stairway where Humphrey's accident occurred. It was Gateway's responsibility to keep the leased premises safe, as nothing in the lease imposes this responsibility on the landlord. *Sheehan* v. *El Johnan, Inc.*, 38 Mass. App. Ct. 975, 975 (1995), and cases cited ("If a tenant . . . occupies the entire premises — i.e., there are no areas used in common with other tenants — then the tenant is responsible for keeping the premises safe, absent a contractual undertaking to the contrary by the landlord"). Under these long-standing rules, the landlord is not liable for Humphrey's injury.

We need not decide whether an exception is warranted for commercial landlords who retain control over leased premises to a degree that justifies holding it liable for a third party's injuries, despite an express agreement that the landlord has no responsibility for repairs on the leased premises, and despite our adherence to the common-law rule in the commercial context. The record here does not suggest that the landlord retained such a high degree of control.

In his brief, Humphrey claims that Florence Byron stored and removed items from the basement, reserved the right to enter the premises, used common driveways and parking spaces, restricted the color of paint that the tenants could use in the interior, prohibited most animals and certain chemicals from the premises, and prohibited repairs and alterations without their approval. Except for the last claim, none of these claims of "control" suggests that the landlord had any control over maintenance or repair of the leased premises.[9] At most, the landlord's continued access to the basement would have made it aware of the unsafe stairway. See *Agustynowicz* v. *Bradley*, 25 Mass. App. Ct. 405, 408 (1988) ("We think it unreasonable in the circumstances . . . to expect the defendant owners to undertake responsibility for maintaining the door" even though one owner was on actual notice of condition of door). These considerations do not outweigh the lease provision expressly giving control of the leased premises to Gateway.

The lease does provide that Gateway must obtain the landlord's approval before making any repairs or alterations.[10] The lease also contains a provision permitting the landlord to "make repairs and alterations compatible with Lessee's use of premises if they should elect so to do."[11] However, a landlord's reservation of "various rights to make alterations and repairs and to approve [the tenant's] alterations and repairs," and specifically a requirement in a lease "that the landlord give its

---

[9]Not all of Humphrey's claims of control were presented to the motion judge or can be substantiated in the record.

[10]There is, however, no evidence that Gateway sought but failed to obtain the landlord's approval to repair the stairway.

[11]The phrase "compatible with Lessee's use of premises" is a handwritten addition to the preprinted lease, limiting the landlord's right to make repairs and alterations.

prior written consent to construction that the tenant proposes to undertake," does not render the landlord liable to the injured plaintiff for an injury occurring on the leased premises. *Tuchinsky* v. *Beacon Prop. Mgt. Corp.*, *supra* at 471. As the Appeals Court commented, "That sort of clause is thought to enable a landlord to protect the structural integrity of its building." *Id.*, citing Bloom, Lease Drafting in Massachusetts §§ 7.56-7.60 (Mass. Continuing Legal Educ. 1996). These provisions do not "alter the basic allocation of responsibilities that the parties have worked out in their detailed lease, namely, that the tenant is in control of and responsible for its leased space and that the landlord is not." *Id.* at 472.

5. *Nuisance.* Humphrey's amended complaint alleges no cause of action for nuisance. However, in his opposition to the motion for summary judgment, he suggested that the stairs constituted a "nuisance" that preexisted the lease, and relied on *Whalen* v. *Shivek*, 326 Mass. 142 (1950), for the proposition that a commercial landlord is liable for the injuries of a third party in such circumstances. As the judge noted, the facts in the *Whalen* case differ significantly from this case because Humphrey's accident occurred within the landlord's property, not outside it. See *id.* at 153-154 ("owner of premises upon which there is a nuisance . . . cannot avoid liability to a third person who is injured thereby *outside the premises* by showing that prior to the injury he had let the premises to another" [emphasis added]). More fundamentally, the plaintiff in *Whalen* stated separate causes of action for nuisance and negligence, and the discussion, *id.* at 153-160, pertained only to the nuisance counts. See *id.* at 154-155 (motion for directed verdict on nuisance counts properly denied; submission of negligence counts to jury harmless although "the evidence, and the stipulations . . . required the finding that control had passed to the tenant"). The *Whalen* case is inapposite to this negligence case. There is no evidence, or even an allegation, that the landlord, by permitting the stairs to remain in their defective condition, interfered with Humphrey's use and enjoyment of any other property in which he had an interest, see, e.g, *Doe* v. *New Bedford Hous. Auth.*, 417 Mass. 273, 288 (1994), quoting *Asiala* v. *Fitchburg*, 24 Mass. App. Ct. 13, 17 (1987) (private nuisance), or that the

stairs "interfere[d] with the exercise of a public right by directly encroaching on public property or by causing a common injury." *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass. 140, 148 (1986) (public nuisance).

*Judgment affirmed.*