Curran, Dennis J., J.
After a fire destroyed their real and personal property (“property”), the plaintiffs Robert and Judith Devaney commenced this action against their insurance broker, defendant Affiliated Insurance Managers, Inc., alleging that their property was underinsured as a result of Affiliated’s negligence and breach of contract in increasing the limits under their homeowners insurance policy from Cambridge Mutual Fire Insurance Co. Affiliated filed a third-party complaint against insurer Cambridge Mutual seeking indemnification and contribution to the extent of Affiliated’s liability. This case is before the court on Affiliated’s motion for summary judgment on the Devaneys’ direct claims against it, on its own third-party claims against Cambridge Mutual, and on Cambridge Mutual’s cross motion for summary judgment on Affiliated’s third-party claims. For the following reasons, Affiliated’s motion is DENIED and Cambridge Mutual’s cross motion is ALLOWED.
I. BACKGROUND
The following facts are undisputed and, where disputed, viewed in the light most favorable to the non-moving party. See Nelson v. Salem State Coll., 446 Mass. 525, 535 (2006).
1. Affiliated and Cambridge Mutual
In July 2000, Affiliated entered into an Agency Agreement with Cambridge Mutual. The Agency Agreement characterized Affiliated as Cambridge Mutual’s “agent,” and Cambridge Mutual agreed to make its “underwriting facilities” available to Affiliated in its capacity as agent. Exhibit B. Cambridge Mutual also “grantfed] authority to [Affiliated as its agent] to receive and accept proposals for such contracts of insurance covering risks on properties located in [specific areas] . . .” Id. This authority was “subject, however, to restrictions placed upon such Agent by [Cambridge Mutual] and by the laws of the states in which such Agent is authorized to write insurance business and to the terms and conditions . .. set out” in the Agency Agreement itself. Id. Among these terms and conditions is the agreement that
Agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as [Cambridge Mutual] may, from time to time, authorize to be insured, subject to the limitations and restrictions as set forth in this [Agency] Agreement, and as set forth in the Underwriting Guide to be furnished to the Agent by [Cambridge Mutual] which is to be made a part of this [Agency] Agreement; to collect, receive and receipt for premiums on insurance, tendered by the Agent to and accepted by [Cambridge Mutual] and to retain out of premiums so collected, as full compensation on business so placed with [Cambridge Mutual], commissions under such terms and limitations as may be mutually agreed upon.
Id. Subject to these restrictions, Affiliated’s authority extended to binding homeowners’ insurance with dwelling coverage up to $850,000, and to insuring houses to 80% of replacement cost. Exhibit A, at 34-35.[1]
The Agency Agreement also provided that Cambridge Mutual “shall not be responsible for Agent expenses such as rentals, transportation facilities, clerk hire, solicitors’ fees, postage, advertising, exchange, personal local license fees, or any other Agency expenses whatsoever.” Exhibit B. Affiliated and Cambridge Mutual agreed that the Agency Agreement “supersedes all previous agreements, whether oral or written, between [Cambridge Mutual] and Agent and may be terminated by either party at any time upon written notice to the other.” Id.
Cambridge Mutual made a “cost estimator” program available on its website to assist its agents, such as Affiliated, in estimating the replacement cost of dwellings. Marshall Swift manufactured the cost estimator program that Cambridge Mutual made available on its website. The information this program yielded would, in turn, determine the amount of insurance coverage for a particular dwelling. David Winn, an underwriter for Cambridge Mutual, states in his affidavit that “[a]gencies like Affiliated, operating under agreements with Cambridge Mutual. . . are expected to insure houses for the proper amounts. So they are supposed to go and make an evaluation of the house. They can use the cost estimator system available on our website ... [as long as they] make an evaluation that the property complies with the 80 percent insurance to replacement costs provision.” Exhibit Q, par. 7. Additionally, “Cambridge Mutual relies upon the independent agencies, like Affiliated to ensure that the *22 underwriting guidelines are in fact being complied with and that the appropriate level of insurance is being issued.” Exhibit Q, par. 8; Exhibit A, at 58 (testifying that Cambridge Mutual relies on agency representation that, e.g., “it was standard construction versus pre-1930”).
Winn testified in his deposition as to Cambridge Mutual’s general procedure upon receiving an insurance application accompanied by a cost estimator, stating that the underwriting department reviews the cost estimator “to make sure that it was reasonable, if the agency [e.g., Affiliated] submitted a cost estimator and it said the house had 4,000 square feet and the cost estimator requested [$]200,000 coverage .. . then [Cambridge Mutual] would probably do an inspection to verify what the replacement cost or to get a better handle on what the replacement cost was.” Exhibit A, at 36. He agreed that if the underwriting department “[saw] that there’s some kind of red flag or that a value appeared] to be off, then Cambridge [Mutual] would take steps to find out why or to do it’s [sic] own inspection!.]” Exhibit A, at 37. He further testified that the Cambridge Mutual underwriter would typically “make sure that the cost estimator said [the requested coverage amount] or that it was within the 90 percent criteria. We would not necessarily review the accuracy of each item on the estimator . . . [W]e would not go and research the file to make sure that the information was identical.” Exhibit A, at 56; see supra n.1.
2. Affiliated and the Devaneys
The property, consisting of the Devaneys’ home and its contents, is located at 52 Bancroft Avenue, Reading, Massachusetts. The dwelling went through two notable renovations in the 1980s, one being the addition of a family room to the first floor, and another being the conversion of the attic into the master bedroom and bath.
Shaun Kelly was a long-time friend of Mr. Devaney. At all times relevant to this action, Kelly had a Massachusetts insurance broker’s license and was an account executive at Affiliated. Affiliated did not pay Kelly a salary; rather Kelly worked on commission, receiving 50% of all new business and renewals he generated.[2] Kelly had been acquiring insurance for the Devaneys since at least 1999 and chose the insurance company with which to place their policy.[3] Mr. Devaney testified throughout his deposition that he considered Kelly to be an insurance expert, and that he agreed to and accepted whatever Kelly gave him.
In April 2002, Kelly obtained a homeowner’s insurance policy for the property from Cambridge Mutual for the period of April 5, 2002 through April 5, 2003. At that time, the dwelling coverage was $217,500 and personal property coverage, always 50% of the dwelling coverage, was $108,750. The original homeowners’ insurance policy application that Affiliated submitted to Cambridge in 2002 indicates that the dwelling was built in 1901.[4] Exhibit N. The “Renovation Update” section of this 2002 policy application indicates that the dwelling’s roofing was fully updated in 1998; the dwelling’s wiring was partially updated in 1999; the dwelling’s plumbing was partially updated in 2000; and the dwelling’s heating was fully updated in 2000.
The policy automatically renewed each year thereafter, including for the period of April 5, 2006 through April 5, 2007. The dwelling coverage and, as a consequence, personal property coverage increased each year, to $233,000 and $116,500 in 2003, $249,500 and $124,750 in 2004, and $267,000 and $133,500 in 2005.[5]
For the period of April 5, 2006 through April 5, 2007, the policy was to provide dwelling coverage of $286,000 and personal property coverage of $143,000. In preparation for his retirement from Affiliated, however, Kelly reviewed the policy in March 2006. Using a Residential Property Record Card for the property from the Town of Reading Assessor’s Office, Kelly provided Affiliated employee Dale Ermer with information[6] to enter into the cost estimator in order to determine the value of the Devaneys’ dwelling. The Residential Property Record Card indicated that the dwelling’s “Eff Yr Built” was 1960, and the “Year Built” was 1890. Exhibit G. According to Kelly, “Eff Yr Built” refers to the “effective date of construction,” and the entry of 1960 means that the dwelling “was a standard home that could be rebuilt with roughly fifty-year-old construction materials.” Exhibit C, at 126; see Exhibit P, at 87 (defining “effective date of construction” as “house has been substantially renovated since the year of construction, and they’re using an effective date of construction”). Kelly testified at his deposition that, at the time he performed the cost estimation, he was aware that the dwelling was constructed in 1890. Exhibit C, at 72.[7]
Ermer used the information with which Kelly provided her without verifying it herself and entered it into the cost estimator.[8] She chose the “Standard” category[9] on the cost estimator program, and the cost estimator program yielded a value of $326,402; on the “Year Built” line of the cost estimator document is the entry “1890[.]” Exhibit H.[10] Ermer generated a second cost estimator document for which she chose the “pre-1930" category; this category yielded a value of $448,067.[11]
In response to Kelly’s e-mailed question concerning the status of the cost estimator, Ermer wrote on March 15, 2006, that the “Standard construction” yielded a value of $317,545, and the “Pre-1930 construction” 3d elded a value of $448,067. Exhibit R. She also wrote, “We need to speak however before you contact insured as there are discrepancies between the information on your work sheet and the policy info.” Id. Kelly testified at his deposition that he told Ermer that he would review the cost estimators and telephone the Devaneys. Exhibit C, at 94.
*23 Although Affiliate’s practice was to maintain a record of telephone calls and written correspondence concerning an account, Affiliated has no record that Kelly discussed his policy review with the Devaneys. That notwithstanding, both Kelly and Mr. Devaney testified at their depositions that they had a telephone conversation concerning Kelly’s review. There is no dispute that Mr. Devaney agreed to the increase over the phone and that Kelly did not discuss the personal property limit or the higher cost estimator result.
Mr. Devaney testified at his deposition that, during this phone call, Kelly informed him that his insurance had to increase, but he could not recall if Kelly mentioned a specific number. According to Kelly, he telephoned Mr. Devaney and told him that it appeared that the policy limit “should go up.” Exhibit C, at 55. He presented Mr. Devaney with only the lower of the two cost estimators, reasoning at his deposition that, “(b)ecause the Town’s document had identified the house as an effective age of 1960,... a house with an effective construction of 1960 I thought would be an appropriate limit to rebuild the house based on Cambridge’s estimate.” Exhibit C, at 95. He testified at his deposition that he told Mr. Devaney, “looks like the limit is low. I think you can build a nice house for this limit.” Exhibit C, at 97.
On March 16, 2006, Affiliated submitted to Cambridge Mutual a Policy Change Request for the Property in which Affiliated sought to change the dwelling coverage from $286,000 to $327,000. Exhibit I. Pursuant to the notation, “Cost estimator attached” that appears at the bottom of the Policy Change Request,[12] Affiliated provided Cambridge Mutual with a copy of the cost estimator document that employed the “standard” category and yielded a value of $326,402. Id, Affiliated never provided Cambridge Mutual with the higher cost estimate document that yielded a value of $448,067.
Winn states in his affidavit that “[t]he higher calculation of $448,067 should have been submitted to Cambridge Mutual since the property was, in fact, pre-1930 construction.” Exhibit Q, par. 14. Winn further explained in his deposition that, “if [Affiliated] said this is standard construction, in the absence of any other photos of the house or appraisal or inspection, [Cambridge Mutual] would go along with what [Affiliated] said.” Exhibit A, at 61; see supra, n.7.
Thereafter, Cambridge Mutual issued the policy with dwelling coverage of $327,000; the personal property coverage automatically recalculated to 50% of that amount, $163,500. In his deposition, Winn testified that Cambridge Mutual’s position is that Affiliated “may have misclassified the property.” Exhibit A, at 37.
3. The Fire and its Aftermath
A fire destroyed the property on December 1, 2006. Cambridge Mutual hired Fred Newall as the insurance adjuster for the Devaneys’ claim after the fire. As an insurance adjuster, Newall would generally “go out to met the insured, go to the home, inspect the damages, and send a report back to the insurance company” that would “determine the value of the lost property!.]” Exhibit 6, at 9-10. Newall calculated the “replacement value” of the Devaneys’ dwelling as $520,950 by multiplying the number of square feet by $175, with $175 representing “an average cost of replacing a home per square foot.” Exhibit 6, at 16. Newall also calculated “the actual cash value of the Devaneys’ dwelling as $442, 807 by depreciating the replacement value amount by 15%, i.e., by multiplying the replacement value by 0.85; Newall based the depreciation percentage on the age of the dwelling.[13] Exhibit 6, at 18-19.[14]
Newall also calculated the replacement value and actual cash value of “the contents” of the property, as $214,989.49 and $165,000, respectively. Exhibit D, at 84; Exhibit 6, at 80. Newall reached this amount “[b]y reviewing the claim for the replacement cost, and if the items ... appeared to be greater than what [one] would normally expect to pay for an item, then [he would] have to reduce them.” Id. The Devaneys’ insurance adjuster, William DePiano estimated that the replacement cost for the Devaneys’ personal property was $270,348.81.[15] Exhibit 2, at 45. DePiano testified at his deposition that “[t]he loss far exceeded the policy limit. . .” Exhibit 2, at 15.
Cambridge Mutual paid the Devaneys the full amount under the policy, i.e., $327,000 for the dwelling and $163,500 for the personal property.[16] The Devaneys allege that their losses exceed these amounts. Specifically, in his answers to interrogatories, Mr. Devaney asserts that the dwelling was under-insured by $85,833, and that the personal property was underinsured by $101,848.[17] Exhibit L.
The Devaneys’ new dwelling at 52 Bancroft Avenue was completed around August 2007.
4. Affidavit of John J. Walsh
John J. Walsh holds Massachusetts licenses as an insurance broker, an insurance advisor, and a special insurance broker, and he has previously been admitted to testify in Massachusetts courts “involving the alleged errors and omissions of insurance agents.” Exhibit 7, pars. 3-6. After having reviewed written discovery and deposition transcripts, Walsh offers the following opinions to a reasonable degree of professional certainty: Kelly “did not act as a reasonable and prudent insurance broker and producer of [Affiliated] in the handling of the [Devaneys’] homeowners insurance and, as a result, the [Devaneys] suffered financially’!;] and Kelly “did not act as a reasonable and prudent insurance broker in his efforts to calculate and effectuate the policy limit increase to the [Devaneys’] building linrit during the policy period preceding the fire.” Exhibit 7, pars. 11, 12.
*24 Walsh further opined to a reasonable degree of professional certainty that if Kelly, “as a producer for [Affiliated], acted as a reasonable and prudent insurance broker, the [Devaneys’] home would have been properly insured to replacement cost at the time of the fire.” Exhibit 7, par. 13. He concluded that, “as a direct result of [Affiliated’s] failures to adhere to the standard of care usual to an insurance broker, the [Devaneys’] building and personal property were both underinsured at the time of the fire.” Exhibit 7, par. 14.
II. DISCUSSION
“The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.” Humphrey v. Byron, 447 Mass. 322, 325 (2006), quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 816 (2004); see Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy its burden either by submitting affirmative evidence negating an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989); see Polaroid Corp. v. Rollins Envtl Servs., Inc., 416 Mass. 684, 696 (1993) (“[B]are assertions and conclusions ... are not enough to withstand a well-pleaded motion for summary judgment”).
The Devaneys allege that Affiliated’s failure to comply with the standard of care applicable to an insurance broker caused their property to be underinsured at the time of the fire. Affiliated asserts that, in determining the proper limit to cover the property', it used the “cost estimator” software program that Cambridge Mutual supplied. In moving for summary judgment, Affiliated argues, first, that even if the Devaneys suffered an underinsured loss to their dwelling, the liability for such loss lies with Cambridge Mutual; and, second, that Affiliated did not know and could not have known that the personal property coverage was inadequate because the Devaneys did not request higher coverage limits for their personal property. Cambridge Mutual, in turn, moves for summary judgment on the grounds that it cannot be liable for Affiliated’s actions because the Devaneys base their claims against Affiliated on its capacity as their agent.
1. Affiliated’s Motion for Summary Judgment on the Devaneys’ Claims
The Devaneys have established that they will be able to prove at trial that they relied on Kelly, Mr. Devaney’s long-time friend, to procure adequate insurance coverage for the property, that their property was underinsured, and that Affiliated, through Kelly, breached the standard of care of a reasonable and prudent insurance broker by failing to procure properly an increase in their coverage limit.[18] See Wilson v. James L. Cooney Ins. Agency, 66 Mass.App.Ct. 156, 161 (2006) (holding that broker was insured’s agent who “undeniably had certain duties to him, including ‘us[ing] due care in the implementation of the agency . . . and in carrying out instructions of the principal-client’ ” (alteration and ellipses in original) (quoting Bicknell, Inc. v. Havlin, 9 Mass.App.Ct. 497, 500 (1980))); Martinonis v. Utica Nat’l Ins. Group, 65 Mass.App.Ct. 418, 420-21 (2006) (holding that, generally, insurance agent has no duty “to ensure that the insurance policies procured by him provide coverage that is adequate for the needs of the insured” unless insured shows “that special circumstances prevailed that gave rise to a duty on the part of the agent to ensure that adequate insurance was obtained”); see also McCue v. Prudential Ins. Co. of Am., 371 Mass. 659, 661-62 (1976) (“Whether the [special] circumstances which create such liability exist is a jury question”).
To the extent that Affiliated challenges the Devaneys’ claims with respect to their personal property, the summary judgment record supports Affiliated’s position that the Devaneys did not request higher coverage for their personal property and that Affiliated did not know that the Devaneys’ personal property was underinsured. The summary judgment record establishes, however, that personal property coverage is always 50% of dwelling coverage;[19] the summary judgment record does not establish — nor do the Devaneys appear to claim — that Affiliated could have deviated from that formula. Thus, any wrongdoing with respect to the coverage amount necessarily encompasses coverage for both the dwelling and the personal property.
Accordingly, Affiliated’s motion for summary judgment as to the Devaneys’ claims against it is DENIED.
2. Affiliated’s and Cambridge Mutual’s Cross Motions for Summary Judgment on Affiliated’s Third-Party Claims
The question these motions raise is whether Affiliated’s relationship with Cambridge Mutual renders the latter responsible for the former’s liability, if any. Third-party actions brought pursuant to Mass.R.Civ.P. 14(a)[20] are “intended to be used in situations of indemnity or possible contribution.” Gabbidon v. King, 414 Mass. 685, 686 (1993); see Reporter’s Notes to Mass.R.Civ.P. 14 (“Rule 14 frankly aims at telescoping litigation. It will therefore find *25 appropriate use in situations of indemnity, and in situations testing the possibility of contribution among joint tortfeasors . . .”). A third-party complaint cannot survive if it does not allege derivative or secondary liability. Gabbidon, 414 Mass. at 687, and cases cited.
“The principles of contribution and indemnity are designed to give effect to [the] differences between joint and several liability.” Elias v. Unisys Corp., 410 Mass. 479, 482 (1991). A close analysis of the principles underlying indemnification and contribution indicate that Affiliated’s third-party claims cannot survive.
A. Indemnification
1. Without Fault
Indemnification “is a common-law right available to one who is ‘without fault, [and] compelled by operation of law to defend himself against the wrongful act of another.’ ” Thomas v. EDI Specialists, Inc., 437 Mass. 536, 538 n.1 (2002) (alteration in original), quoting Santos v. Chrysler Corp., 430 Mass. 198, 217 (1999); Decker v. Black & Decker Mfg. Co., 389 Mass. 35, 40 (1983) (“This right to indemnity is limited to those cases in which the would-be indemnitee is held derivatively or vicariously liable for the wrongful act of another”); Slocum v. Donahue, 44 Mass.App.Ct. 937, 939 (1998) (same). “The general rule is that a person who negligently causes injury to a third person is not entitled to indemnification from another person who also negligently caused that injury.” Rathbun v. Western Mass. Elec. Co., 395 Mass. 361, 364 (1985); Decker, 389 Mass. at 40 (“[indemnity is permitted only when the would-be indemnitee does not join in the negligent act”); Slocum, 44 Mass.App.Ct. at 939 (1998) (same). Therefore, indemnification is proper “where the person seeking indemnification did not join in the negligent act of another but was exposed to liability because of that negligent act.” Rathbun, 395 Mass. at 364; see, e.g., Elias, 410 Mass. at 482 (holding that indemnification permits someone like [defendant employer], who is blameless, to be reimbursed for damages caused by the wrongful act of its employee). “Only in exceptional cases . . . has indemnity been allowed to one who was not free from fault.” Rathbun, 395 Mass. at 364. In those rare situations where “indemnity has been allowed to a negligent indemnitee, the indemnitee’s negligence has been insignificant in relation to that of the indemnitor.” Id.
Affiliated cannot meet this threshold requirement to indemnification eligibility. The Devaneys base their claims against Affiliated on the allegation that the property was underinsured, i.e., their insurance coverage was too low. The process to determine the amount of coverage for a particular property includes the completion of a “cost estimator” which Cambridge Mutual makes available on its website. The summary judgment record establishes that Affiliated, through Kelly, made the affirmative decision to submit only the lowest cost estimator to Cambridge Mutual. Whether or not the property was underinsured is a question for the fact-finder to resolve, but Affiliated cannot be held free from fault in the event of a finding in the Devaneys’ favor, nor can its involvement in this act be considered “insignificant” as a matter of law in relation to any conduct by Cambridge Mutual. See Rathbun, 395 Mass. at 364; see, e.g., LeBlanc v. Logan Hamilton Joint Venture, 78 Mass.App.Ct. 699, 708 (2011) (holding that party “cannot reasonably assert a claim for indemnification by reason of its triable actual negligence in these undisputed circumstances”).
2. Circumstances Giving Rise to Indemnification
That conclusion notwithstanding, the circumstances here do not support a claim of indemnification. “[D]ifferent sets of circumstances may give rise to indemnification ... [A] contractual right to indemnification may be implied from the nature of the relationship between the parties . . . [or] a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties.” Araujo v. Woods Hole, Martha’s Vineyard, Nantucket S.S. Auth, 693 F.2d 1, 2 (1st Cir. 1982) (internal citations omitted).[21]
a. Implied Right to Indemnification
With respect to the first circumstance, “[a] right to indemnification may not be implied merely from the fact that [the third-party plaintiff] was subjected to tort liability for an injuiy that it believes [the third-party defendant] played a role in causing.” Id. Rather, “[s]uch a right will be implied only in two circumstances.” Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A., 395 Mass. 366, 375 (1985). First, “a contractual right to indemnity will be implied .. . when ‘there are unique special factors’ demonstrating that the parties intended that the putative indemnitor bear the ultimate liability.” Decker, 389 Mass. at 38-39, quoting Araujo, 693 F.2d at 2; see Larkin v. Ralph O. Porter, Inc., 405 Mass. 179, 184 (1989) (“[Courts] have inferred the - existence of indemnity agreements only when the terms of the contract themselves contemplated such indemnification”); see, e.g., Fall River Hous. Auth v. H.V. Collins Co., 414 Mass. 10, 14-15 (1992) (citing cases where court found implied contractual right to indemnify). Second, the contractual right will be implied “when there is a generally recognized special relationship between the parties.” Araujo, 693 F.2d at 2-3.
Notwithstanding that a party “may not obtain indemnification for its own negligence under a theory of implied contractual indemnity!,]” Kelly v. Dimeo, Inc., 31 Mass.App.Ct. 626, 628 (1991), the Agency Agreement here does not indicate that Affiliated and Cambridge Mutual contemplated indemnification. In fact, the parties agreed that Cambridge Mutual would not be responsible for any of Affiliated’s expenses. See, e.g., Central Trust Co. v. Rudnick, 310 Mass. 239, 248 (1941) (holding that no right to indemnification could *26 arise from contract “where contract itself shows that the parties did not intend that such right should result, or where to invoke such right would amount to the alteration of a contract by imposing on one of the parties an obligation that none of the parties to the contract ever intended should be imposed”). Compare Fireside Motors, Inc., 395 Mass. at 375 (holding that parties’ agreement did not contain “any language from which [the court] could imply a contractual right to indemnification” where agreement contained no warranties, express or implied, against defective materials and workmanship and where agreement provided merger clause that stated that agreement set forth extent of parties’ agreements), with Great Atl. & Pac. Tea Co., Inc. v. Yanofsky, 380 Mass. 326, 332-33 (1980) (“holding that liability for indemnification by implied agreement will be presumed from the fact of an agreement to make repairs to leased premises”).
Additionally, the parties have not provided, and research does not disclose, any case standing for the proposition that the mere fact of their agency relationship entitles Affiliated to indemnification from Cambridge Mutual. See, e.g., Medeiros v. Whitcraft, 931 F.Sup. 68, 76 (D.Mass. 1996) (“There quite simply is no relationship between the third-party plaintiffs and the third-party defendant, i.e., agent and principal, such as would give rise to any vicarious or derivative responsibility one for the other”).
Accordingly, Cambridge Mutual is entitled to summaiy judgment on Affiliated’s third-party claim for implied contractual indemnification (Count II). Cambridge Mutual’s motion is ALLOWED, and Affiliated’s motion is DENIED.
b. Common-Law Tort-Based Indemnification
Common-law tort-based indemnification “exists independently of statute, and whether or not contractual relations exist between the parties.” Fireside Motors, Inc., 395 Mass. at 370. ‘The tort-based theory of indemnification .. . [was] [designed to shift the whole loss upon the more guiliy of the two tortfeasors, . . . [and] it has usually been available only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault.” Araujo, 693 F.2d at 3, see id. (limiting “passive negligence” to instances in which the indemnitee was vicariously or technically liable). The party seeking common-law tort indemnification cannot have “jointed] in the negligent act but [rather] is exposed to derivative or vicarious liability for the wrongful act of another.” Fireside Motors, Inc., 395 Mass. at 369, quoting Stewart v. Roy Bros., 358 Mass. 446, 459 (1970).
As established above, it was Affiliated’s affirmative act of submitting only the lowest cost estimator result to Cambridge Mutual that allegedly resulted in the Property’s being underinsured. Therefore, according to the summary judgment record, Affiliated, not Cambridge Mutual, was actively at fault. See Araujo, 693 F.2d at 3. Accordingly, Cambridge Mutual’s motion for summary judgment on Affiliated’s third-party claim for common-law indemnification (Count I) is ALLOWED, and Affiliated’s motion is DENIED.
B. Contribution
“The right to contribution, unlike the right to indemnity, is based on the shared fault of the joint tortfeasors.” Elias, 410 Mass. at 482; Slocum, 44 Mass.App.Ct. at 939. General Laws c. 23 1B, §1 “provides for a right to contribution ‘where two or more persons become jointly liable in tort,’ . . . and permits a tortfeasor to seek partial reimbursement from a party who is jointly liable if he has paid more than his ‘pro rata share’ of the damages.” Thomas, 437 Mass. at 538-39, quoting G.L.c. 23 1 B, §1 (a)(b); see id. at 539 (noting that “statute does not distinguish between intentional torts and negligence”). General Laws c. 23 1 B was “designed equitably to distribute damages among all those liable in tort for the same offense.” Berube v. Northampton, 413 Mass. 635, 638 (1992); see Elias, 410 Mass. at 483 (holding that “system of contribution among joint tortfeasors” meets problem of “ ‘how to compensate an injury inflicted by the acts of more than one tortfeasor’ ” (citation omitted)); Hayon v. Coca Cola Bottling Co. of New England, 375 Mass. 644, 648 (1978) (noting that purpose of G.L.c. 23 1B was to remedy “the unfairness of allowing a disproportionate share of the plaintiffs recovery to be borne by one of several joint tortfeasors, and the object to be accomplished was a more equitable distribution of that burden among those liable in tort for the same injury”).
“An action for contribution is not barred if, at the time the tortious activity occurred, the party from whom contribution is sought could have been held liable in tort.” McGrath v. Stanley, 397 Mass. 775, 781 (1986) (emphasis in original); LeBlanc, 78 Mass.App.Ct. at 712 n. 11; Savers Prop. & Cas. Ins. Co. v. Admiral Ins. Agency, Inc., 61 Mass.App.Ct. 158, 163 n.6 (2004) (“Common-law contribution requires that both joint tortfeasors be directly liable to the injured party”); see, e.g., Economy Eng’g Co. v. Commonwealth, 413 Mass. 791, 793-94 (1992) (holding that where defendant’s “negligence was independent of [plaintiffs] negligent and defective design of the ladder [that injured third party], [plaintiff] was entitled to contribution from its joint tortfeasor, the [defendant]... [and] [f]or the same reason, the [defendant] had no common law right of indemnity against [plaintiff]”).
Notwithstanding that the Devaneys have not brought a direct claim against Cambridge Mutual, Affiliated alleges in its third-party complaint that it is entitled to contribution from Cambridge Mutual because Cambridge Mutual was negligent “with respect to the features of its cost estimator system, and with respect to its maintenance and updating of the values used in its cost estimator system.” Third-Party Complaint, par. 18; cf. LeBlanc, 78 Mass.App.Ct. at 712 n. 11 (noting that Supreme Judicial court has “unset- *27 tied the earlier view that contribution requires the accomplished joint liability of the contributing and receiving parties to the plaintiff’). The summaiy judgment record establishes that Affiliated, through Kelly and Ermer, first, entered information into the cost estimator that yielded at least two and likely three coverage amounts, and, second, opted to submit the lowest cost estimator to Cambridge Mutual. The summary judgment record indicates that the highest value Affiliated obtained from the cost estimator was $448,067, and that the Devaneys claim that their dwelling was underinsured by $85,833 and their personal property was underinsured by $101,848. Clearly, if Affiliated had chosen the highest cost estimator of $448,067, the Devaneys would not have been underinsured.
Affiliated has not demonstrated that it will be able to prove at trial that its affirmative choice to submit only the lowest cost estimator value resulted from any negligence by Cambridge Mutual. The cost estimator yielded a result that would have adequately insured the Devaneys; Affiliated cannot share with Cambridge Mutual its liability, if any, for not choosing that result.
Cambridge Mutual’s motion for summaiy judgment on Affiliated’s third-party claim for contribution (Count III) is ALLOWED and Affiliated’s motion is DENIED.
ORDER
For these reasons, it is ORDERED that Affiliated’s motion for summary judgment is DENIED, and Cambridge Mutual’s cross motion for summaiy judgment is ALLOWED.

 Later in this same deposition, Cambridge Mutual underwriter David Winn testified that “one of the requirements is that the house be insured 90 percent of the estimated replacement cost value.” Exhibit A, at 49; see Exhibit A, at 56-58, 73. The discrepancy is unclear.

 In turn, Cambridge Mutual treated agents, such as Kelly, as independent contractors and did not pay them a salary. Exhibit 1, at 30.

 The parties do not dispute that Cambridge Mutual was only one of the insurers with which Affiliated wrote policies.

 At his deposition, Winn identified a copy of the 2002 policy application that had the “1901" crossed out and ” 1924" written in. He explained that Cambridge Mutual has
a program that provides houses built in 1925 or later a discounted rate. And in some cases if the house is built prior to 1925, but has been extensively renovated, then the agency [e.g., Affiliated] or the underwriter [at Cambridge Mutual] would have the authority to put it into the more favorable rate territory. And when we do that we enter the year built as 1924 because then we know it’s a house that really wasn’t built. .. after 1925, but we allowed it to get the lower pricing of the 1925 policy.
Exhibit A, at 44.
The parties have not submitted this altered policy application.

 Kelly testified at his deposition that Cambridge Mutual’s policy amounts increase each year based on “an inflation guard feature.” Exhibit C, at 64.

 Kelly’s deposition testimony indicates that this “information” came from a worksheet which he completed in longhand; he then provided this worksheet to Ermer. The parties have not submitted this worksheet. Ermer testified at her deposition that she also had a copy of the Residential Property Record Card for the Property from the Town of Reading Assessor’s Office at the time she entered the information into the cost estimator. Exhibit P, at 51.

 At his deposition, Winn explained that
[t]he fact that the property had received renovations would not change it from standard to pre-1930 or vice versa. The pre-1930 class, it involves the original construction of the house. If the house is ... a very-well [sic] built house for 1890, typically built for maybe a mercantile owner, or an executive of 1890, it would fall into the pre-1930 class. If the house is built for the average worker of 1890, then it would fall into the standard class. The agency [i.e., Affiliated] felt that it was ordinary standard construction at the time that he did this estimator and that’s what he put in there. He reviewed it, he felt that this was ordinary construction, not elaborate, Victorian-iype construction, so he changed it from pre-1930 to standard... [I]f the agency said this is standard construction, in the absence of any other photos of the house or appraisal of inspection, [Cambridge Mutual] would go along with what he said.
Exhibit A, at 60-61.

 Ermer testified at her deposition that she received informal training in operating the cost estimator program from her supervisor at Affiliated. Winn testified at his deposition that “there’s information on the website” about “how to select the categories or construction types” on the cost estimator program. Exhibit A, at 62. Any instructions, however, are “those that are supplied by the Marshall Swift Company.” Exhibit A, at 66. Cambridge Mutual itself does not supplement those instructions.

 Winn testified at his deposition that the cost estimator program “automatically defaults to the pre-1930 [category] . . . The agency then has to affirmatively take it out of the pre-1930 class and put it into the standard class.” Exhibit A, at 62. Ermer could not recall whether the cost estimator program had any defaults as to any of the entries. Exhibit P, at 112-13.

 The parties appear to be in agreement that Exhibit H is this cost estimator. The entry next to “Year Built” is 1890, and “Construction Type” is “Standard!.]”

 The parties have not supplied a copy of this second cost estimator document. Additionally, given Ermer’s March 2006 e-mail mentioned below, and Kelly’s and Ermer’s deposition testimony, it is likely that Ermer generated a third cost estimator. See Exhibit R (March 2006 e-mail exchange between Ermer and Kelly); Exhibit C, at 153-55 (acknowledging the possibility that a third cost estimator was generated); Exhibit P, at 69-71 (same). But see Exhibit P, at 94 (“It appears there were three different numbers, but there was probably only one cost estimator”), and at 102 (“I don’t believe they were three separate printout estimators. I think they were just revised within the system”).

 Despite the notation, this exhibit does not include a copy of the cost estimator, but there is no dispute as to which cost estimator document Affiliated provided to Cambridge Mutual. See supra, n. 10.

 Newall explained at his deposition that, “[i]f it’s a brand-new home, there may be no depreciation. If it’s recently new, maybe 5 percent, 10 percent. But the [Devaneys’] home had some age to it.” Exhibit 6, at 19.

 Mr. Devaney used these numbers — $520,950 for replacement cost, $442,808 for actual cash value — in his answers to interrogatories as representing “Our Loss” for the dwelling. Exhibit L.

 In his answers to interrogatories, Mr. Devaney represents that “Our Loss” for personal property was $270,348.81. This number was the replacement cost; the actual cash value was “not calculated!.]” Exhibit L.

 According to Mr. Devaney’s answers to interrogatories, the Devaneys also received the following additional amounts under the policy: $16,350 for debris removal (dwelling); $5,000 for debris removal (personal property); and $13,625 for trees and shrubs. Exhibit L.

 The contract price for reconstruction of the dwelling was $429,341.48, according to an exhibit discussed at Mr. Devaney’s deposition. Mr. Devaney testified that the Devaneys spent approximately $480,000 to rebuild the dwelling. He also testified that the Devaneys put the $163,500 personal property limit towards the reconstruction of the dwelling. Neither of the Devaneys knows how much money they spent to replace their personal property.

 The court notes that the Devaneys appear to allege that they suffered only economic harm as a result of Affiliated’s conduct. “]T]he economic loss doctrine bars recovery unless the [Devaneys] can establish that the injuries they suffered due to [Affiliated’s] [alleged] negligence involved physical harm or property damage, and not solely economic loss.” Cumis Ins. Soc’y, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 469 (2009). The court renders no decision as to this issue, however, as the parties have not raised it.

 In fact, the amount by which the Devaneys allege that their personal property was underinsured, $101,848, is less than 25% of $412,833, which is the sum of the coverage the Devaneys actually had, $327,000, plus the amount by which they allege the dwelling was underinsured, $85,833.

 “At any time after commencement of the action a defending party, as a third-party plaintiff, may... cause a summons and complaint to be served upon a person who is or may be liable to him for all or part of the plaintiffs claim against him.” Mass.R.Civ.P. 14(a).

 Courts recognize that the existence of an express agreement between the parties is a third circumstance that may give rise to a right to indemnification. Id.; Kelly v. Dimeo, Inc., 31 Mass.App.Ct. 626, 628 (1991) (“Under Massachusetts law, a contract-based right to indemnification exists only if there is a binding contract between indemnitor and indemnitee in which such right is expressed ...”). As the Agency Agreement between Affiliated and Cambridge Mutual undisputedly does not contain an indemnification provision, this circumstance is irrelevant.