KELLY A. LeBLANC, administratrix,[1] *vs.* LOGAN HILTON JOINT VENTURE & others.[2]

No. 09-P-364.

Suffolk. November 16, 2009. - February 9, 2011.

Present: CYPHER, SIKORA, & FECTEAU, JJ.

Further appellate review granted, 460 Mass. 1101 (2011).

*Practice, Civil,* Wrongful death, Summary judgment, Counterclaim and cross-claim. *Negligence,* Architect, Building contractor, Contractual limitation of liability, Duty to warn, Electricity, Expert opinion, Joint tortfeasor. *Contract,* Architectural services, Construction contract, Construction of contract, Indemnity. *Indemnity. Contribution among Tortfeasors.*

In a wrongful death civil action arising from the electrocution of the plaintiff's decedent while he was working on a large construction project, summary judgment was properly allowed in favor of the two codefendant architectural parties on a codefendant subcontractor's negligence cross claim for indemnification, where the subcontractor's failure to install warning signage on the equipment that electrocuted the decedent, especially after a notification letter sent by one of the architectural parties, constituted actual causal negligence barring indemnification. [708-709]

In a wrongful death civil action arising from the electrocution of the plaintiff's decedent while he was working on a large hotel construction project, the judge erred in allowing summary judgment in favor of the two codefendant architectural parties on the cross claim of the codefendant hotel builder and owner (hotel) for indemnification, where, viewing the agreement between the hotel and the architectural parties (contract) comprehensively, the failure of the architectural parties to notify the hotel of a subcontractor's failure to install warning signage on the equipment that electrocuted the decedent created a geniune issue of causal negligence for a trial [709-710]; and where the specific contractual duties of the architectural parties, the absence of detection and notification to the hotel, and the special hazard of electricity created an issue of causal negligence comprehensible to a layperson without the assistance of expert testimony [710]; therefore, the hotel remained eligible for indemnification by the architectural parties under both the contract and common-law doctrine [711].

This court declined to consider the issue of contribution between codefendants in a civil action, where the record and briefs were insufficient. [711-712]

[1] Of the estate of Roger LeBlanc.

[2] Broadway Electrical Co., Inc.; Shallbetter, Inc.; Cosentini Associates-MA, LLP; United Power Group, Inc.; Cambridge Seven Associates, Inc.

CIVIL ACTION commenced in the Superior Court Department on January 25, 2005.

A motion for summary judgment was heard by *John C. Cratsley*, J., and entry of separate and final judgment was ordered by him.

*William P. Rose* for Broadway Electrical Co., Inc.

*Curtis L.S. Carpenter* for Logan Hilton Joint Venture.

*Kenneth B. Walton* for Cosentini Associates-MA, LLP.

*Matthew M. O'Leary* for Cambridge Seven Associates, Inc.

SIKORA, J. The appeal in this wrongful death action requires us to define the potential liability of architectural parties in the circumstances of a large construction project, an extensive contract for their services, and the involvement of multiple codefendants. It presents a challenging exercise in civil procedure.

On August 4, 2004, Roger LeBlanc, a maintenance electrician employed by the Massachusetts Port Authority, was electrocuted as he began work upon transmission equipment at the Hilton Hotel at Logan International Airport in Boston. The cabinets containing the transmission equipment lacked the critical diagram and script necessary to warn workers of the potentially lethal flow of electricity through the equipment. The administratrix of his estate brought this wrongful death action against six defendants. See G. L. c. 229, §§ 2 & 6. With two exceptions specified hereafter, the defendants brought cross claims for indemnification and contribution against each other. Settlement with some defendants and summary judgment in favor of the others resolved all claims by the estate. Cross claims among four codefendants persisted. A judge of the Superior Court resolved them by summary judgment. He concluded that the terms of the contract for services between the hotel builder and owner, Logan Hilton Joint Venture (Hilton), and the building architect, Cambridge Seven Associates, Inc. (Cambridge Seven), precluded liability of Cambridge Seven and its consultant, Cosentini Associates-MA, LLP (Cosentini), for indemnification and contribution to Hilton and the construction subcontractor for electrical services, Broadway Electrical Co., Inc (Broadway Electrical). For the following reasons we affirm in part and reverse and remand in part.

*Background.* 1. *The project and the parties.* For construction

of the airport hotel, Hilton[3] and Cambridge Seven executed an extensive "Architectural Services Agreement" (the owner-architect agreement) on or about February 5, 1997. The owner-architect agreement contemplated a construction period of approximately twenty-two months concluding in November of 1999, a building capacity of up to 600 rooms, and interior common, commercial, and utility space of more than 80,000 square feet.

Cambridge Seven then contracted with Cosentini for consultant services including "electrical engineering services necessary to enable [Cambridge Seven] to complete its services for Hilton, as defined in the [owner-architect agreement]." We refer to those two firms as the architectural parties. Hilton employed Beacon Skanska USA (Beacon) as general contractor. Beacon employed Broadway Electrical as the electrical subcontractor. Shallbetter Inc., of Wisconsin (Shallbetter), manufactured and supplied the transmission equipment. United Power Group, Inc. (United Power), inspected and installed the equipment.

2. *Contractual relations.* a. *Architect's duties.* The owner-architect agreement enumerated for Cambridge Seven a range of construction phase duties. Cambridge Seven had the obligation to submit to Hilton at two-week intervals written reports of its on site observations of work progress and quality. "In particular, [Cambridge Seven] shall promptly inform Hilton in writing of any deficiencies in [w]ork and/or deviations from the requirements of the [c]onstruction [c]ontract which come to [its] attention." Owner-architect agreement § 2.7.3(b). Cambridge Seven was to visit the site at appropriate intervals, familiarize itself with the pace and competence of the work, and determine generally whether performance accorded with construction documents. *Id.* at § 2.7.4.[4] It was to review, approve, or take other appropriate action upon contractor submittals "such as [s]hop [d]rawings . . . for the purpose of checking for conformance with information given in the [c]onstruction [d]ocuments." *Id.* at § 2.7.11.[5]

---

[3]Then as the business entity of Hilton Hotels Corporation, Inc.

[4]This responsibility did not demand "exhaustive or continuous on-site inspections to check quality or quantity of [w]ork."

[5]Construction documents included specifications prepared by the architect and its consultants for use in bidding and construction of the project. *Id.* at § 1.9.

Another set of duties was the certification of work for payment by Hilton to the general contractor. Cambridge's Seven's recommendation of amounts due for payment constituted a representation to Hilton that the extent and quality of the related work conformed to the construction contract. *Id.* at § 2.7.7. Prior to substantial completion of the work, Cambridge Seven was to "arrange and observe tests and inspections required in the [c]onstruction [c]ontract for check-out, start-up and performance testing of all major equipment and specialized building systems . . . , including applicable . . . electrical . . . systems." *Id.* at § 2.7.14. Cambridge Seven's recommendation to Hilton of compliance with contractual requirements enabled Hilton's issuance of the certificate of substantial completion. *Id.* at § 2.7.15. For certification of final completion, Cambridge Seven was to prepare a "punch list" of incomplete or unacceptable items and to confirm the satisfactory completion of those items. *Id.* at §§ 2.7.16 & 2.7.17. As a prerequisite to the issuance of the certificate of final completion and final payment, Cambridge Seven had to find and to inform Hilton, with supporting documentation, that the general contractor had achieved compliance with the construction contract. *Id.* at §§ 2.7.19 & 2.17.20.

Finally the owner-architect agreement provided that Cambridge Seven would indemnify Hilton against all financial losses caused by negligent acts, errors, or omissions committed in the course of its contractual professional services or those of its consultants. *Id.* at §§ 9.1 & 9.4.

b. *Architect's exemptions.* Several other provisions of the owner-architect agreement limited Cambridge Seven's duties or exempted it from responsibility. Under § 2.1.9, Cambridge Seven was not responsible for the general contractor's "failure to carry out [w]ork in accordance with the [c]onstruction [c]ontract. [It] shall not have control over or charge of acts or omissions of [the general contractor], its subcontractors, vendors or their respective agents or employees . . . ." Under § 2.7.12, despite Cambridge Seven's approval of such work papers as shop drawings from the general contractor, the general contractor remained responsible "for substantiating installation instructions, and for the performance of equipment or systems being provided by [the general contractor]. Likewise, [Cambridge

Seven's] approval of a specific item shall not indicate approval of an assembly of which the item is a component."

c. *Contract between Cambridge Seven and Cosentini.* The owner-architect agreement authorized Cambridge Seven to retain professional consultants as necessary for the full provision of its services. *Id.* at § 2.1.4(a). The terms of any such arrangement were subject to the provisions of the owner-architect agreement. *Id.* at § 2.1.4(b). Cambridge Seven would remain "fully responsible for the timely and proper performance of [s]ervices by its [c]onsultants . . . to the same extent as if all such [s]ervices were performed by [Cambridge Seven's] personnel." *Id.* at § 2.1.4(c). The ensuing consultant contract between Cambridge Seven and Cosentini incorporated the owner-architect agreement and obligated Cosentini to perform for Cambridge Seven all pertinent services owed by Cambridge Seven to Hilton.

3. *The electrical transmission equipment.* The parties do not dispute the nature of the electrical transmission equipment. Within the electrical supply industry, it was known as "switchgear." For commercial consumers of high voltage electricity, it provided surge protection, measurement of current, and, in the configuration employed at the hotel, it switched or converted the flow of electricity from one distribution source to an alternate distribution source in the event of a power outage. Two transformers served the hotel. They reduced high voltage to low voltage as the electricity entered the building. A transformer failure could cause an outage. If one distribution line became inoperable, the gear switched the incoming flow to another line so as to preserve delivery and measurement of the supply.

At the hotel, ten cabinets housed the switchgear. From left to right, they carried numbers 1 through 10. Cabinet 1 at the left end of the formation contained a main incoming feeder and an external parallel cable connection to a "tie switch" in cabinet 9. Cabinet 10 at the right end of the row contained a main incoming feeder and an external parallel cable connection to a "tie switch" in cabinet 2. In normal operation, electricity ran from the incoming feeder to cabinet 1, through cabinet 1, and through the external connection to cabinet 9. Electricity ran also from the incoming feeder to cabinet 10, through cabinet 10, and through the external connection to cabinet 2. The electricity

would then pass through metering devices and into the hotel. The external connections enabled the alternate routes of flow.

The switchgear brought with it the danger of two live currents of electricity known as the "backfeeder hazard." Without adequate warning of the presence of two live lines of power, an electrical worker might assume that the suppression of one line eliminated all live flow through the equipment. As one safety measure, a switchgear cabinet system could employ an interlocking key system designed to prevent access to an energized cabinet. As a separate warning system, the face of the cabinets could bear an explanatory diagram known as a "mimic bus" and signage text alerting workers to the presence of the hazard. Here, the switch-gear cabinets had an interlocking key system designed to prevent access to energized compartments. When LeBlanc arrived at the switchgear for maintenance purposes on August 4, 2004, all the doors on the switchgear cabinet were opened, so as to bypass the interlocking key system. No warning diagram or text appeared on the face of the switchgear cabinets. LeBlanc suffered electrocution when he opened cabinet 1 and touched the gear.

4. *Specifications for the warning signage.* Cosentini prepared voluminous specifications for the project entitled "Basic Electrical Materials, Methods and Requirements." Two adjacent specifications addressed the subject of warning signage for the switchgear:

> "Provide on the front face of primary gear a stenciled 'mimic bus' diagram showing schematically the primary busing and switching arrangement."

> "Provide warning sign on or adjacent to any switching equipment whose blades may be alive when in the open position. Sign shall read 'WARNING—LOAD SIDE OF SWITCH MAY BE ENERGIZED BY BACKFEED.' "

In the absence of any date on the specifications (or in the parties' briefs), we infer that Cosentini drafted and delivered them early in the course of its work at some point in 1997.

By letter dated January 5-6, 1999, United Power, after testing and inspection of the switchgear, forwarded a report to Broadway Electrical itemizing eleven deficiencies or uncompleted tasks. The sixth item read as follows:

> "Signs should be installed on Units 1, 2, 9 and 10 that inform operating personnel that fuses can be energized from several sources both incoming lines and tie switch. The tie switch should have a warning sign indicating switch is fed from two sources."

Cosentini received a copy of the report. On January 20, 1999, it wrote to Broadway Electrical with commentary upon each of the eleven items. As to the switchgear warning, Cosentini stated:

> " 'Signage on 15kv, Gear Doors[,]' we concur with this recommendation and the signs should be installed. The wording and placing of signs should be submitted as a shop drawing."

The record does not show any subsequent action upon the recommendation. On January 26, 1999, the Cosentini construction administrator for the project conducted a "field observation" of electrical work at the site, observed the activation of the switchgear still without warning signage, and on January 27, 1999, forwarded a report of his observations to Cambridge Seven. The report itemized certain on-site deficiencies but made no mention of the absence of switchgear warning signage.

It is undisputed that no diagram or signage appeared on or near the cabinets at the time of the electrocution. Since planning and construction occurred during the period of 1997 through 1999 and since the accident occurred on August of 2004, we infer that the hotel project had proceeded through certifications for payment and to final completion during the interim.

*5. Proceedings in Superior Court.* The decedent's estate sued Hilton for negligence and gross negligence; and Cambridge Seven, Cosentini, Broadway Electrical, Shallbetter, and United Power upon theories of negligence, gross negligence, and breach of warranty. In turn, Hilton, Broadway Electrical, Shallbetter, and United Power, respectively, sued the other five codefendants for indemnification and contribution upon claims of faulty acts or omissions proximately causing or contributing to the wrongful death. Each of the architectural parties, Cambridge Seven and Cosentini, cross-claimed against the other four codefendants for indemnification and contribution upon theories

of faulty acts or omissions, but did not cross-claim against each other.[6]

The litigation subsequently narrowed. The motion judge granted summary judgment to Cambridge Seven and Cosentini against all claims of the plaintiff estate and the codefendants' cross claims, and affirmed his reasoning and result in response to motions for reconsideration. The judge subsequently entered summary judgment in favor of United Power against all claims of the estate and all cross claims of codefendants. The estate and the remaining codefendants, Hilton, Broadway Electric, and Shallbetter, then reached a settlement of an approximate value of $3 million to the estate.

Hilton and Broadway Electrical have preserved their appeals from the allowance of summary judgment against their cross claims for indemnification and contribution from Cambridge Seven and Cosentini. The correctness of that judgment is the sole subject of the present appeal.

The motion judge specified several grounds for summary disposition of the cross claims. One was that the owner-architect agreement withheld from Cambridge Seven and Cosentini both the authority and the duty to ensure the implementation of the appropriate warning signage on the switchgear equipment required by the project specifications. The motion judge weighed especially the limiting language of § 2.1.9, denying the architectural parties "control over . . . omissions of [the general contractor and] its subcontractors," as demonstration of the absence of a legal duty of care toward the decedent; and § 2.7.12 as the imposition of responsibility for compliance with "installation instructions" as the continuing duty of a subcontractor, and not of the architectural parties.

A second ground was the absence of proffered expert opinion of the architectural parties' negligence as an instance of professional malpractice and causation. Additionally, the judge found that the "plain language of § 2.1.9" exempted Cambridge Seven and Cosentini from subcontractor errors as a matter of law (the

---

[6]Hilton subsequently brought a third-party complaint against general contractor Beacon. Beacon brought a fourth-party complaint against Broadway Electrical and Acadia Insurance Company. Those claims proceeded to settlement and play no part in this appeal.

interpretation of an unambiguous contract) so as to render expert opinion irrelevant.

Finally, the judge determined that the architectural parties were immune from liability for *contribution* to any codefendants as a matter of law because neither was directly liable to the plaintiff estate as a prerequisite for such exposure.

*Analysis.* In review of the allowance of summary judgment, the appellate court conducts a de novo inspection of the record presented to the motion judge. See, e.g., *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007); *Easton Holding Corp.* v. *Congress Financial Corp. (New England)*, 74 Mass. App. Ct. 737, 740 (2009). It will assess the factual materials in the light most favorable to the unsuccessful opposing party. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). It will draw permissible inferences and resolve any evidentiary conflicts in the opponent's favor. See *Jupin* v. *Kask*, 447 Mass. 141, 143 (2006); *DiPietro* v. *Sipex Corp.*, 69 Mass. App. Ct. 29, 30 (2007). Conversely, the reviewing court may affirm summary judgment upon any visible ground in the record, even one different from the rationale of the motion judge. See, e.g., *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*; *GTE Prod. Corp.* v. *Stewart*, 421 Mass. 22, 36 (1995).

In the present appeal, the four participating parties have confined their arguments to the question whether, for purposes of indemnification and contribution, any genuine issue of material fact exists that Cambridge Seven or Cosentini performed negligently so as to cause, or to contribute to the cause of, the fatal accident. Under Massachusetts decisions, it is settled that a defendant performing contractual duties "is liable to third persons not parties to the contract who are foreseeably exposed to danger and injured as a result of its negligent failure to carry out [a contractual] obligation." *Parent* v. *Stone & Webster Engr. Corp.*, 408 Mass. 108, 114 (1990), quoting from *Banaghan* v. *Dewey*, 340 Mass. 73, 80 (1959). Accord, *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 367-368 (1997). See Restatement (Second) of Torts § 324A (1965). Generally, summary judgment is unsuitable for disposition of negligence claims because the issue of reasonable care will be one of fact. *Roderick* v. *Brandy Hill Co.*, 36 Mass. App. Ct. 948, 949 (1994).

"Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury." *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983), quoting from *Zezuski* v. *Jenny Mfg. Co.*, 363 Mass. 324, 327 (1973). See, e.g., *Orfiner* v. *Biswanger*, 25 Mass. App. Ct. 928, 929-931 (1987) (affidavit material and discovery results permitted a question of negligence on the part of one defendant driver, but not on the part of another).

1. *Summary judgment against Broadway Electrical's claim for indemnification.* In his thorough memoranda of decision, the motion judge allowed summary judgment in favor of Cambridge Seven and Cosentini and against Broadway Electrical's cross claim for indemnity upon the independent grounds (a) that § 2.1.9 (architectural parties have no control over or charge of acts or omissions of general contractor or subcontractors) and § 2.7.12 (general contractor and subcontractors remain responsible for implementing instructions) exempted the architectural parties from liability for the errors of subcontractors; and (b) that Broadway Electrical's failure to install warning signage —especially after Cosentini's notification letter of January 20, 1999 — had constituted actual causal negligence barring indemnification.

We affirm upon the second ground. Broadway Electrical cannot reasonably assert a claim for indemnification by reason of its triable actual negligence in these undisputed circumstances. Massachusetts doctrine permits indemnification to a party bearing vicarious or derivative liability for the wrongful acts or omissions of another so long as it did not participate in those acts or omissions. See e.g., *Stewart* v. *Roy Bros.*, 358 Mass. 446, 458-459 (1970); *Rathbun* v. *Western Mass. Elec. Co.*, 395 Mass. 361, 364 (1985); *Elias* v. *Unisys Corp.*, 410 Mass. 479, 482 (1991) (a party "without fault, compelled by operation of law to defend himself against the wrongful act of another, [may] recover from the wrongdoer the entire amount of his loss, including reasonable attorney's fees"). Clearly, Cosentini *twice*, once in 1997 and again on January 20, 1999, furnished Broadway Electrical with specific instructions to install the warning signage. The specification was important. It dealt with a serious danger. Broadway Electrical's arguments against Cambridge Seven and Cosentini reduce ultimately to the contention that the architectural

parties should have protected Broadway Electrical against its own oversight. No causal negligence by the architectural parties supports any claim of Broadway Electrical for indemnity.

2. *Summary judgment against Hilton's claim for indemnification*. The motion judge based summary judgment against indemnification of Hilton upon two independent grounds: (a) immunity conferred by the owner-architect agreement; and (b) the lack of expert opinion in support of claimed professional negligence.

(a) *Contractual grounds*. The judge emphasized that §§ 2.1.9 and 2.7.12 of the owner-architect agreement relieved Cambridge Seven and Cosentini from any duty to "ensure" compliance with specifications, to force "*implementation* of the design," or to "compel conformance" to specifications by the general contractor and the subcontractor. Taken alone, those provisions support that conclusion. However, those clauses operate in coordination with multiple other contractual duties of the architect.

As recounted above, Cambridge Seven and therefore consultant Cosentini had duties to visit the site and to provide Hilton with biweekly reports of work progress and competence and especially of any deficiencies or deviations from contractual requirements. They had the duty of certification of the quantity and quality of work for purposes of payment to the general contractor and the subcontractors. They also bore responsibility to arrange and observe tests and inspections for "electrical systems." A full appreciation of the parties' intentions and their duties requires a comprehensive view of the contract. See *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995); *General Convention of the New Jerusalem in the U.S., Inc.* v. *MacKenzie*, 449 Mass. 832, 835 (2007). Every provision of the agreement will have some effect. See *Bray* v. *Hickman*, 263 Mass. 409, 414 (1928); *Boston Elev. Ry.* v. *Metropolitan Transit Authy.*, 323 Mass. 562, 569 (1949).

In this wider view, Cambridge Seven and Cosentini did not have authority or responsibility for control and command over the contractor and subcontractors; they did have abundant duties to the project owner, Hilton, of *observation and notification* of the quantity and quality of work.[7] Those duties were important

---

[7]While the issue of comprehensive contract interpretation was an element of the summary judgment papers, the parties' appellate briefs have provided this

because Hilton did possess a vital long-term interest in the safety of the hotel electrical equipment and in the concomitant power to compel compliance with contractual specifications by withholding payment. This chain of duty and risk was foreseeable. The parties were dealing with the inherently dangerous component of electricity. The failure to monitor and to report any deficiency to Hilton constituted a contractual breach and created a field of risk for third parties likely to come into contact with the switchgear. Therefore, the failure of Cosentini and Cambridge Seven to notify Hilton of Broadway Electrical's failure to install the warning signage (even though Cosentini notified Broadway Electrical) creates a genuine issue of causal negligence for a trial.[8]

(b) *Expert opinion evidence.* The absence of an expert opinion in support of Hilton's claim of negligence by the architectural parties does not doom the claim to summary judgment defeat in these circumstances. The evidence and inferences of insufficient monitoring and notification can generate a genuine issue of material fact. The specific contractual duties, the absence of detection and of notification to Hilton, and the special hazard of electricity prevent the necessary demonstration by the architectural parties of an entitlement to summary judgment. Those factors create an issue of causal negligence comprehensible to a layperson without the assistance of expert testimony. See *Parent v. Stone & Webster Engr. Corp.*, 408 Mass. at 113-115 & n.8 (where electrician suffered personal injury by reason of an unlabeled electrical distribution panel, contractual documents established duties of construction engineering firm and plaintiff did not need the affidavit of an expert electrical engineer to avoid summary judgment).[9]

---

court with far more detailed textual analysis than they afforded the motion judge for the task of sifting and meshing the ambivalent provisions of the voluminous agreement.

[8] In deposition testimony, an officer of Cosentini testified that the firm's contractual duties could not realistically include enforcement of completion of all punch list items of a project of such magnitude. However, the contract does impose duties of notification to the owner who might then undertake enforcement. In particular, an unfinished safeguard against the danger of electrocution was not an ordinary punch-list item, but rather a special hazard calling for commensurate attention and care.

[9] For any trial on remand, the parties remain free to seek the permission of a motion or trial judge to employ expert opinion. Any such authorization remains in the sound discretion of the judge.

(c) *Indemnification.* Since a genuine issue of actual negligence of the architectural parties remains, Hilton remains eligible for indemnification by Cambridge Seven and Cosentini under both the owner-architect agreement and common-law doctrine. Sections 9.1 and 9.4 of the owner-architect agreement furnish indemnity for all financial losses caused by negligent acts, errors, or omissions of the architect. Under the common-law standard, see Analysis section 1 *supra,* Hilton possesses a triable claim that the architectural parties failed to notify it of the omitted switchgear warnings and that the omission, without any fault of its own, exposed it to liability to the decedent's estate and entitles it to indemnity.

3. *Contribution issues.* The appellate record and briefs do not enable us to address the potential issues of contribution between the architectural parties, on the one side, and Hilton and Broadway Electrical, on the other. The circumstances illustrate the complexities of the Massachusetts contribution statute, G. L. c. 231B, §§ 1 - 4.

First, we do not know whether Hilton and Broadway Electrical complied with G. L. c. 231B, § 3(*d*), in the course of their settlement with the plaintiff estate. To preserve a right of contribution against codefendants, that provision requires a settling party either to make payment discharging the common liability of all defendants, or to agree to make such a payment, and then to pursue the claim for contribution within a year after the payment.[10]

Second, it remains uncertain whether the final judgment entered on August 21, 2008, in favor of the architectural parties and against the plaintiff estate pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), together with the summary judgment

---

[10]In toto, § 3(*d*) reads as follows:

"If there is no judgment for the injury against the tortfeasor seeking contribution, his right of contribution shall be barred unless he has either (1) discharged by payment the common liability within the statute of limitations period applicable to claimant's right of action against him and has commenced his action for contribution within one year after payment, or (2) agreed while action is pending against him to discharge the common liability and has within one year after the agreement paid the liability and commenced his action for contribution."

G. L. c. 231B, § 3(*d*), inserted by St. 1962, c. 730, § 1.

order, and the absence of any appeal from that judgment by the estate, preclude the status of the architectural parties as joint tortfeasors and therefore their susceptibility to contribution under G. L. c. 231B, § 1(a).[11]

We therefore cannot express a reliable view upon the subject of contribution, and order it to remain open among these parties for any further litigation in the Superior Court.

---

[11]Section 1(a) provides as follows:

> "Except as otherwise provided in this chapter, where two or more persons *become jointly liable* in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them" (emphasis supplied).

G. L. c. 231B, § 1(a), inserted by St. 1962, c. 730, § 1.

One line of authority indicates that the entitlement to contribution derives from the plaintiff's primary cause of action and is not available from a party against whom the plaintiff had no cause of action. See *O'Mara* v. *H.P. Hood & Sons*, 359 Mass. 235, 237-238 (1971); *Liberty Mut. Ins. Co.* v. *Westerlind*, 374 Mass. 524, 526 (1978); *Dighton* v. *Federal Pac. Elec. Co.*, 399 Mass. 687, 691 (1987); *Berube* v. *Northampton*, 413 Mass. 635, 638-639 (1992). Other decisions suggest a broader availability of contribution. In *Hayon* v. *Coca Cola Bottling Co. of New England*, 375 Mass. 644, 649 (1978), the court described the statutory term "liable in tort" as "broad in scope" and not confined within a "narrow" range of "potential tort defendants." It expanded the term to include a third-party defendant not sued for direct liability by the plaintiff. *Ibid.* In *McGrath* v. *Stanley*, 397 Mass. 775, 780-782 (1986), the court enlarged the statutory analysis and the apparent category of potential contributors. "The contribution statute is aimed at eliminating the unfairness of allowing a disproportionate share of a plaintiff's recovery to be borne by one of several joint tortfeasors. The object to be accomplished is a more equitable distribution of that burden among those liable in tort for the same injury. . . . An action for contribution is not barred if, *at the time the tortious activity occurred*, the party from whom contribution is sought could have been held liable in tort" (emphasis original). *Id.* at 780-781 (per Hennessey, C.J.).

Summary judgment requires both the facts and the law to be settled in favor of the moving party. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). See *Pederson* v. *Time, Inc.*, 404 Mass. 14, 16-17 (1989); *Gloucester* v. *Civil Serv. Commn.*, 408 Mass. 292, 296-297 (1990). At the very least, the *Hayon* and *McGrath* decisions have unsettled the earlier view that contribution requires the accomplished joint direct liability of the contributing and receiving parties to the plaintiff. The resulting uncertainty and the possible relaxation of that view prevent summary judgment in this instance. The issue on remand is whether the statute permits a tortfeasor (such as Hilton and Broadway Electrical) to pursue contribution from a second party (such as Cambridge Seven and Cosentini) which it can prove to have been jointly liable even if the injured party did not successfully prosecute a claim against that second party to judgment.

*Conclusion.* Therefore we (1) affirm so much of the judgment dated August 21, 2008, as is in favor of Cambridge Seven and Cosentini against Broadway Electrical upon Broadway Electrical's cross claim for indemnification; (2) reverse so much of the judgment dated August 21, 2008, as is in favor of Cambridge Seven and Cosentini against Broadway Electrical upon Broadway Electrical's cross claim for contribution; (3) reverse so much of the judgment dated August 21, 2008, as is in favor of Cambridge Seven and Cosentini against Hilton upon Hilton's cross claim for indemnification and contribution; and (4) remand to the Superior Court Broadway Electrical's and Hilton's cross claims for contribution against Cambridge Seven and Cosentini.

*So ordered.*