KELLY A. LeBLANC, administratrix,[1] *vs.* LOGAN HILTON JOINT VENTURE & others.[2]

Suffolk. April 2, 2012. - August 30, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, & GANTS, JJ.

*Negligence,* Gross negligence. *Warranty. Contract,* Warranty, Performance and breach, Indemnity. *Indemnity. Contribution Among Tortfeasors.*

This court concluded that in the unusual circumstances of a civil action arising from the death of the plaintiff's decedent by electrocution while working on a hotel project (i.e., the owner of the hotel and the construction subcontractor for electrical services had settled with the plaintiff after a grant of summary judgment in favor of the architect of the project and the consultant that the architect had retained to provide electrical engineering services, and the plaintiff therefore no longer had any incentive to appeal from the grant of summary judgment), the hotel owner and construction subcontractor could challenge the grant of summary judgment on their cross claims for contribution against the architect and the consultant [325-327]; further, this court concluded that the Superior Court judge erred in granting summary judgment in favor of the architect and the consultant on those cross claims, where sufficient evidence existed that the plaintiff's decedent's death was caused by the professional negligence of the architect and consultant based on their failure to report known deficiencies to the hotel owner that posed a serious safety risk to anyone who operated certain switchgear [328-331]; on the other hand, the judge properly granted summary judgment in favor of the architect and consultant on a cross claim for indemnity brought by the hotel owner, where under the contract between the hotel owner and the architect, the architect was not responsible for the construction subcontractor's failure to carry out its work in accordance with the construction contract, and where the architect had no control over the construction subcontractor's acts or omissions [331-332].

CIVIL ACTION commenced in the Superior Court Department on January 25, 2005.

A motion for summary judgment was heard by *John C. Cratsley,* J.; motions for reconsideration were also heard by him; and entry of separate and final judgment was ordered by him.

---

[1] Of the estate of Roger M. LeBlanc.

[2] Broadway Electrical Co., Inc. (Broadway); Shallbetter, Inc. (Shallbetter); Cosentini Associates-MA, LLP (Cosentini); Cambridge Seven Associates, Inc. (Cambridge Seven); and United Power Group, Inc. (United Power).

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth B. Walton* (*Patricia B. Gary* with him) for Cosentini Associates-MA, LLP.

*Matthew M. O'Leary* (*Jay S. Gregory* with him) for Cambridge Seven Associates, Inc.

*Curtis L.S. Carpenter* for Logan Hilton Joint Venture.

*William P. Rose* for Broadway Electrical Co., Inc.

GANTS, J. On August 4, 2004, Roger M. LeBlanc (LeBlanc), an electrician employed by the Massachusetts Port Authority (Massport), was killed by electrocution while attempting to repair an electrical transformer at the Logan Airport Hilton Hotel (hotel) in Boston. Kelly A. LeBlanc (plaintiff), as administratrix of her husband's estate, filed suit in the Superior Court against, among others, the owner of the hotel, the Logan Hilton Joint Venture (Hilton); the architect that designed the hotel, Cambridge Seven Associates, Inc. (Cambridge Seven); the consultant Cambridge Seven retained to provide electrical engineering services, Cosentini Associates-MA, LLP (Cosentini); and the construction subcontractor for electrical services, Broadway Electrical Co., Inc. (Broadway), alleging negligence, gross negligence, and breach of warranty. Hilton and Broadway filed cross claims against Cambridge Seven and Cosentini for indemnification and contribution. On October 12, 2007, a judge in the Superior Court granted the motion for summary judgment brought by Cambridge Seven and Cosentini as to the complaint and cross claims, and ordered the entry of separate and final judgment. The plaintiff, Hilton, and Broadway moved for reconsideration; their motions were denied on May 7, 2008. After separate and final judgment entered on August 21, 2008, Hilton and Broadway timely appealed from the grant of summary judgment as to their cross claims. The Appeals Court affirmed the grant of summary judgment as to Broadway's cross claim for indemnification, but reversed as to the remainder of the cross claims and remanded to the Superior Court. *LeBlanc* v. *Logan Hilton Joint Venture*, 78 Mass. App. Ct. 699, 713 (2011) (*LeBlanc*). We granted Cambridge Seven's and Cosentini's

applications for further appellate review.[3] We affirm the judge's grant of summary judgment on behalf of Cambridge Seven and Cosentini as to the cross claims brought by Hilton and Broadway for indemnification but reverse as to the cross claims for contribution.

*Background.* In reviewing the grant of a motion for summary judgment, we conduct a de novo examination of the evidence in the summary judgment record, see *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007), and view the evidence in the light most favorable to the parties opposing summary judgment, here, Hilton and Broadway. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). Therefore, we recite the facts in the light most favorable to Hilton and Broadway.

1. *Facts.* a. *Agreement to provide architectural services.* Hilton and Cambridge Seven executed an agreement in which Cambridge Seven was to provide architectural services to Hilton for construction of the hotel (agreement). Under the agreement, Cambridge Seven was to provide various professional services, including architecture, technical specification writing, coordination of consultants' services, and electrical engineering. It was to prepare "Design Development Documents" for the hotel consisting of "drawings, specifications and other documents which fix and describe the expected final size and character of [the] Project," including "electrical systems materials." Among the "Design Development Documents" it was to deliver were a "[p]reliminary layout of switchgear, transformer and generator placement," and "[o]utline [s]pecifications." Based on the "Design Development Documents," it was to prepare final "Construction Documents," including plans for the design of electrical systems and "[f]inal electrical specifications."

Once the construction phase of the project began, Cambridge Seven was to "visit the site at intervals appropriate to the stage of construction to become familiar with the progress and quality of Work and to determine, in general, if Work is being performed in accordance with the Construction Documents." The agreement specified that Cambridge Seven was not required "to make exhaustive or continuous on-site inspections to check

---

[3]Because Broadway did not seek further appellate review, we do not consider Broadway's cross claims for indemnification.

quality or quantity of Work."[4] Cambridge Seven was required to "[s]ubmit written reports to Hilton every two weeks recording [Cambridge Seven's] observations at the construction Site as to the progress and quality of the Work." In addition, the agreement stated: "In particular, [Cambridge Seven] shall promptly inform Hilton in writing of any deficiencies in Work and/or deviations from the requirements of the Construction Contract which come to [Cambridge Seven's] attention."

When the project was substantially completed, Cambridge Seven was to "prepare a punch list of all incomplete and/or unacceptable systems and/or construction items for all trades, which must be corrected prior to Final Completion." It was then to "ascertain the satisfactory completion by [the general contractor] of all punch list items for purposes of Final Completion."

Cambridge Seven was entitled to retain the professional consultants it deemed necessary to provide the services required under the agreement, but was responsible for their proper performance of services as if these services were performed by its own employees.

The agreement included the following provision, § 2.1.9, limiting Cambridge Seven's responsibilities:

> "Notwithstanding anything in this Agreement which may indicate otherwise, [Cambridge Seven] shall not be deemed to have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with Work being performed at Site. [Cambridge Seven] shall not be responsible for [the general contractor's] schedules or [the general contractor's] failure to carry out Work in accordance with the Construction Contract. [Cambridge Seven] shall not have control over or charge of acts or omissions of [the general contractor], its subcontractors, vendors or their respective agents or employees, or of any other persons performing portions of Work on behalf of [the general contractor]. . . ."

---

[4]The agreement specified that, if required, Hilton could separately request and compensate Cambridge Seven for full-time site representation as an additional service. There is no evidence in the record that Hilton asked Cambridge Seven to provide full-time site representation.

The agreement also provided that Cambridge Seven would indemnify Hilton from and against all claims "arising out of and to the extent caused by the negligent acts, errors or omissions during the performance of professional services" under the agreement by it or its consultants provided that the claims did not "result from the negligent acts or omissions of the Indemnitees or other parties for whom [Cambridge Seven] is not responsible."[5,6]

b. *The switchgear.* The Appeals Court ably described the electrical transmission equipment known in the industry as the "switchgear" at the hotel, and how the absence of instruction regarding its operation led to LeBlanc's death:

"For commercial consumers of high voltage electricity, it provided surge protection, measurement of current, and, in the configuration employed at the hotel, it switched or converted the flow of electricity from one distribution source to an alternate distribution source in the event of a power outage. Two transformers served the hotel. They reduced high voltage to low voltage as the electricity entered the building. A transformer failure could cause an outage. If one distribution line became inoperable, the gear switched the incoming flow to another line so as to preserve delivery and measurement of the supply.

"At the hotel, ten cabinets housed the switchgear. From

---

[5]The indemnitees under the agreement for architectural services (agreement) are Logan Hilton Joint Venture (Hilton), the Massachusetts Port Authority, and their agents and employees.

[6]Section 9.4 of the agreement provided "that the Indemnitees' rights set forth in this [§] 9.5 shall not apply to the extent that any claims, costs, expenses, losses or liabilities result from the negligent acts or omissions of the Indemnitees or other parties for which [Cambridge Seven] is not responsible." Although the sentence speaks of "this [§] 9.5" rather than "this [§] 9.4," we find, for three reasons, that this is a typographical error and that the intent of the parties to the agreement was to refer to the indemnitees' rights set forth in § 9.4. First, the same exclusion is included in § 9.2, which provides indemnification for nonprofessional negligence, and the exclusion there applies to "the Indemnitees' rights set forth in this [§] 9.2." Second, the use of the word "this" before the section number suggests that the intent was to refer to the same section. Third, § 9.5 does not set forth any rights of the indemnitees; it provides, "[Cambridge Seven] shall include provisions in agreements with its Consultants which require its Consultants to assume the same defense and indemnity obligations in favor of [Cambridge Seven] as [it] assumes in favor of the Indemnitees . . . ."

left to right, they carried numbers 1 through 10. Cabinet 1 at the left end of the formation contained a main incoming feeder and an external parallel cable connection to a 'tie switch' in cabinet 9. Cabinet 10 at the right end of the row contained a main incoming feeder and an external parallel cable connection to a 'tie switch' in cabinet 2. In normal operation, electricity ran from the incoming feeder to cabinet 1, through cabinet 1, and through the external connection to cabinet 9. Electricity ran also from the incoming feeder to cabinet 10, through cabinet 10, and through the external connection to cabinet 2. The electricity would then pass through metering devices and into the hotel. The external connections enabled the alternate routes of flow.

"The switchgear brought with it the danger of two live currents of electricity known as the 'backfeeder hazard.' Without adequate warning of the presence of two live lines of power, an electrical worker might assume that the suppression of one line eliminated all live flow through the equipment. As one safety measure, a switchgear cabinet system could employ an interlocking key system designed to prevent access to an energized cabinet. As a separate warning system, the face of the cabinets could bear an explanatory diagram known as a 'mimic bus' and signage text alerting workers to the presence of the hazard. Here, the switchgear cabinets had an interlocking key system designed to prevent access to energized compartments. When LeBlanc arrived at the switchgear for maintenance purposes on August 4, 2004, all the doors on the switchgear cabinet were opened, so as to bypass the interlocking key system. No warning diagram or text appeared on the face of the switchgear cabinets. LeBlanc suffered electrocution when he opened cabinet 1 and touched the gear."

LeBlanc, *supra* at 703-704.

c. *Specifications for the warning signage.* One specification for the switchgear required that it have a stenciled "mimic bus" diagram on the face of the cabinets that showed schematically the configuration of the equipment and the switching arrangement. A second required a warning sign "on or adjacent to any switching equipment" that read: "WARNING—LOAD SIDE OF SWITCH MAY BE ENERGIZED BY BACKFEED."

The manufacturer of the switchgear, Shallbetter, Inc. (Shallbetter), claimed that it did not receive these specifications, and therefore did not install either a mimic bus diagram or a warning sign on the switchgear.

In early January, 1999, United Power Group, Inc. (United Power), a subcontractor retained by Broadway, tested and inspected the installed switchgear, and wrote a report to Broadway setting forth eleven recommendations, including: "Signs should be installed on Units 1, 2, 9 and 10 that inform operating personnel that fuses can be energized from several sources both incoming lines and tie switch. The tie switch should have a warning sign indicating switch is fed from two sources." Cosentini reviewed the report and wrote a letter to Broadway agreeing with United Power's recommendation that signs be installed on the switchgear, and directing that the wording and placement of signs "be submitted as a shop drawing." On January 26, 1999, a Cosentini field engineer conducted a field observation of electrical work at the site and forwarded his report to Cambridge Seven. The report noted that the switchgear had been activated but made no mention of the presence or absence of warning signs on the switchgear. The record does not reflect that Broadway ever submitted a shop drawing depicting the proposed warning signage or that any other action was taken to correct the deficiencies in signage. As a result, there was neither a mimic bus diagram nor the required warning signage on the switchgear when LeBlanc was electrocuted.

2. *Decision on summary judgment.* With respect to the plaintiff's negligence claim, the judge concluded: "There is no doubt that [LeBlanc's] accident was the result of the negligence committed by *some* party, as it is undisputed that the accident was caused by the failure of proper signage being installed on the switchgear" (emphasis in original). But he concluded that, because of the limitation of responsibility in § 2.1.9 of the agreement, neither Cambridge Seven nor Cosentini, which he together characterized as the "Design Team," as a matter of law was "responsible for the failure of the contractors to perform work according to the specifications of the construction documents of the Project, including their failure to install the signage in question." Because the agreement provided that the

architect "shall not have control over or charge of acts or omissions" of the contractor or its subcontractors, and "shall not be responsible" for the contractor's "failure to carry out Work in accordance with the Construction Contract," the judge determined that the Design Team had no duty to "ensure the fulfillment of the design specifications on the Project" and "no practicable means by which it could compel conformance by *any* party to meet its design specifications" (emphasis in original). The judge held that the Design Team's duty to the plaintiff was limited to what it controlled, which was the design of the switchgear, and that there was no allegation that the switchgear had malfunctioned or that the Design Team was negligent in its design. As an independent ground for granting summary judgment, the judge found that the plaintiff could not prevail without expert evidence in support of her claim of negligence. The judge concluded that, where the Design Team was not negligent, it could not be liable for contribution or indemnification.[7,8]

The plaintiff, Hilton, and Broadway moved for reconsideration, and for the first time Broadway submitted an expert affidavit from a professional engineer in support of the claim of negligence. The expert opined that the switchgear was available for inspection by the Design Team but there was no evidence that Cambridge Seven had inspected the switchgear for compliance with the specifications. He also opined that the switchgear design was "flawed and inherently unsafe" because it allowed for confusion in operation and permitted a configuration that bypassed one set of transformers when both were on line. The judge agreed to consider the expert's affidavit but denied the motions for reconsideration. The judge concluded that the expert's opinion regarding the failure of inspection did not affect the conclusion that the Design Team owed no duty to the plaintiff to ensure compliance with its specifications. The judge

---

[7]As to Broadway's common-law claim of indemnification, the judge concluded that Broadway was barred from recovery because, having failed to implement the specifications regarding signage, it was not a merely passive party to the negligent act of another.

[8]The judge determined that there is no implied warranty of architectural services in Massachusetts, and there was no evidence that Cambridge Seven had expressly warranted the switchgear, and thus granted summary judgment for the plaintiff on her breach of warranty claim.

also concluded that the expert's affidavit did not create a genuine issue of material fact that Cambridge Seven or Cosentini had negligently designed the configuration of the switchgear where he made no claim and presented no facts to indicate that the Design Team had failed to satisfy the standard of reasonable care required by the profession.

On June 16, 2008, after the denial of the plaintiff's motion for reconsideration but before the entry of separate and final judgment on behalf of the Design Team, the judge approved the plaintiff's petition for settlement of its claims against Hilton and Broadway for $3 million;[9] as part of the settlement, the plaintiff agreed not to pursue any appeals or motions to reconsider. Therefore, Hilton and Broadway appealed from the allowance of summary judgment, but the plaintiff did not. *LeBlanc, supra* at 706.

3. *The Appeals Court's decision.* The Appeals Court concluded that the Design Team had no authority or responsibility for control and command over the contractor and subcontractors, but that the Design Team owed a duty to Hilton to provide biweekly reports of work progress and competence, and "especially of any deficiencies or deviations from contractual requirements." *Id.* at 709. The court concluded that the Design Team's failure to notify Hilton of Broadway's failure to install the warning signage constituted a contractual breach that posed a "field of risk for third parties likely to come into contact with the switchgear," and thereby created an issue of fact of causal negligence for trial. *Id.* at 710. The court also concluded that expert opinion was not needed to support this claim of professional negligence because the issue of causal negligence was "comprehensible to a layperson" in view of the Design Team's contractual duties, the special hazards of electricity, and the evidence of insufficient monitoring and notification. *Id.*

Having identified a genuine issue of fact as to both negligence and causation, the court held that the judge erred in granting summary judgment as to Hilton's claims of indemnification, both under its contract with Cambridge Seven and under the

[9]Shallbetter joined in this settlement.

common law. *Id.* at 711.[10] It concluded that summary judgment was correctly granted on Broadway's claim of common-law indemnification, because Broadway's claim essentially was that the Design Team should have protected it from "its own oversight." *Id.* at 708-709.

The court, however, determined that it could not "express a reliable view upon the subject of contribution" for two reasons. *Id.* at 712. First, it stated that it could not determine from the record whether Hilton and Broadway complied with the provisions of G. L. c. 231B, § 3 (*d*), which requires a settling party either to make a payment discharging the common liability or to agree to discharge the common liability and then pursue the claim for contribution within one year of the payment. *Id.* at 711. Second, the court declared that "[s]ummary judgment requires both the facts and the law to be settled in favor of the moving party," and there was an unsettled issue of law as to "whether the final judgment . . . in favor of the architectural parties . . . together with the summary judgment order, and the absence of any appeal from that judgment by the estate, preclude the status of the architectural parties as joint tortfeasors and therefore their susceptibility to contribution under G. L. c. 231B, § 1 (*a*)." *Id.* at 711-712 & n.11.

*Discussion.* 1. *Cross claims for contribution.* The Appeals Court correctly recognized that it was confronted with an issue not presented to the motion judge: whether the cross claims for contribution could survive where a separate and final judgment had entered on the motion for summary judgment in favor of Cambridge Seven and Cosentini against the plaintiff, which the plaintiff had not challenged on appeal. The Appeals Court, however, erred in concluding that summary judgment cannot be granted unless the law is "settled in favor of the moving party." *Id.* at 712 & n.11. Rule 56 (c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), states that summary judgment shall be granted if "there is no genuine issue as to

---

[10]Although the Appeals Court held that "Hilton remains eligible for indemnification by Cambridge Seven and Cosentini under both the owner-architect agreement and common-law doctrine," *LeBlanc* v. *Logan Hilton Joint Venture*, 78 Mass. App. Ct. 699, 711 (2011), Hilton has made clear on further appellate review that it is pursuing only a contractual indemnity claim.

any material fact and . . . the moving party is entitled to a judgment as a matter of law." Nothing in the rule suggests that the law in question must be settled before summary judgment may be granted. Where the material facts are undisputed but the law governing a motion for summary judgment is unsettled, it is the responsibility of the motion judge to interpret the unsettled law and order summary judgment. Where the facts are undisputed, a judge may not deny a motion for summary judgment on the grounds that the law is unsettled, because the case would then proceed to trial and there would be no factual question to resolve at trial. In the unusual circumstances presented here, where the issue of law became ripe only after judgment entered, it is an appellate court's responsibility to decide the question of unsettled law. We do so now.

Under G. L. c. 231B, § 1 (*a*), "where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them." "It is plain that the evil to be remedied [by c. 231B] was the unfairness of allowing a disproportionate share of the plaintiff's recovery to be borne by one of several joint tortfeasors, and the object to be accomplished was a more equitable distribution of that burden among those liable in tort for the same injury." *Hayon* v. *Coca Cola Bottling Co. of New England*, 375 Mass. 644, 648 (1978). "Contribution claims are derivative and not new causes of action." *Berube* v. *Northampton*, 413 Mass. 635, 638 (1992). No right of contribution exists unless the party would be "directly liable to the injured person." *O'Mara* v. *H.P. Hood & Sons*, 359 Mass. 235, 238 (1971). See *Berube* v. *Northampton, supra,* and cases cited ("Without liability in tort there is no right of contribution"). "If one has a personal defense or special status that would bar liability, contribution is not allowed because it is only permitted 'from those *liable*, and not from those who are shown merely to be at fault' " (emphasis in original). *Id.* at 639, quoting Hennessey, Torts: Indemnity and Contribution, The New Contribution Statute, 47 Mass. L.Q. 421, 428 (1962).

Here, if Cambridge Seven and Cosentini were negligent, they would be directly liable to the plaintiff, and Hilton and Broadway

could seek contribution from them for their pro rata share of the settlement. See G. L. c. 231B, § 1 (*b*) (total recovery of joint tortfeasor in contribution "shall be limited to the amount paid by him in excess of his pro rata share"). The Design Team, however, argues that it cannot be directly liable to the plaintiff because the plaintiff did not appeal from the judge's grant of summary judgment in their favor, thereby precluding any claim that the Design Team may be directly liable to the plaintiff.

"A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . .' " *Fidler* v. *E.M. Parker Co.*, 394 Mass. 534, 539 (1985), quoting *Montana* v. *United States*, 440 U.S. 147, 153 (1979). Here, having failed timely to appeal from the grant of summary judgment, the plaintiff would be precluded from bringing a new action claiming that the Design Team was liable to the estate on its wrongful death claim. But if Hilton and Broadway were precluded from prosecuting their contribution claim because the plaintiff, having settled with them, chose not to appeal her claims against the Design Team, then Hilton and Broadway effectively would be denied their right to appeal from the judge's summary judgment finding that the Design Team was not negligent. And if this were our rule, then Hilton and Broadway would be able to preserve their contribution claim against the Design Team only by refusing to settle with the plaintiff, so that the plaintiff would join in the appeal from the summary judgment granted to the Design Team. In these unusual circumstances, where the defendants seeking contribution have settled with the plaintiff after the grant of summary judgment to a defendant who is also a third-party defendant, and the plaintiff therefore no longer has any incentive to appeal from the grant of summary judgment, we conclude that the parties seeking contribution may challenge the judge's grant of summary judgment. In such a case, if summary judgment is vacated the defendants may then prosecute their contribution claim. We therefore reach the merits of whether the motion judge erred in concluding that the Design Team could not be found negligent.

"It is settled that a claim in tort may arise from a contractual relationship, . . . and may be available to persons who are not parties to the contract. . . . [A] defendant under a contractual obligation 'is liable to third persons not parties to the contract who are foreseeably exposed to danger and injured as a result of its negligent failure to carry out that obligation.' " *Parent* v. *Stone & Webster Eng'g Corp.*, 408 Mass. 108, 113-114 (1990) (*Parent*), quoting *Banaghan* v. *Dewey*, 340 Mass. 73, 80 (1959). Where a contractual relationship creates a duty of care to third parties, the duty rests in tort, not contract, and therefore a breach is committed only by the negligent performance of that duty, not by a mere contractual breach. See *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 368 (1997), quoting *Abrams* v. *Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 144 (1937) ("Although the duty arises out of the contract and is measured by its terms, negligence in the manner of performing that duty as distinguished from mere failure to perform it, causing damage, is a tort").

Here, the Design Team owed a contractual duty to design the configuration of the electrical system. It also owed a duty to visit the site at appropriate intervals to become familiar with the progress and quality of the work and "to determine, in general, if Work is being performed in accordance with the Construction Documents." Informed by these site visits, Cambridge Seven was to submit biweekly reports of its observations at the construction site and promptly inform Hilton of any deficiencies in the work or any deviations from the requirements of the construction contract that came to its attention. Viewing the evidence in the record in the light most favorable to Hilton and Broadway, there was sufficient evidence that the Design Team committed a breach of their contractual obligations by failing to report to Hilton that Broadway had failed to comply with the specifications regarding the mimic bus and the warning signage. See *Watson, Watson, Rutland/Architects, Inc.* v. *Montgomery County Board of Educ.*, 559 So. 2d 168, 174 (Ala. 1990) (architect had legal duty under contract to notify owner of known defect).

There was no expert opinion, however, that the Design Team's failure to report to Hilton about Broadway's noncompliance with these two specifications constituted a breach of the profes-

sional standard of care of architects.[11] Architects, like other professionals, do not have a duty to be perfect in their work, but rather are expected to exercise "that skill and judgment which can be reasonably expected from similarly situated professionals." *Klein* v. *Catalano*, 386 Mass. 701, 718 (1982), quoting *Mounds View* v. *Walijarvi*, 263 N.W.2d 420, 424 (Minn. 1978). Expert testimony is generally needed to establish this professional standard of care. See *Pongonis* v. *Saab*, 396 Mass. 1005, 1005 (1985) (legal malpractice); *Collins* v. *Baron*, 392 Mass. 565, 569 (1984) (medical malpractice); *Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. 221, 226-227 (1999) (legal malpractice in failing to present expert testimony of engineer). We generally require expert testimony because "laymen, including the jury, the trial judge, and ourselves, could not be, and are not, in a position to determine . . . the requirements of professional conduct" in the relevant circumstances. *Haggerty* v. *McCarthy*, 344 Mass. 136, 141 (1962). Only in "exceptional cases," *id.* at 139, quoting *Bouffard* v. *Canby*, 292 Mass. 305, 309 (1935), where the malpractice "is so gross or obvious that laymen can rely on their common knowledge to recognize or infer negligence," do we not require expert testimony. *Pongonis* v. *Saab, supra*.

The Appeals Court concluded that no expert opinion was needed here, citing our opinion in *Parent*. See *LeBlanc, supra* at 710. In *Parent, supra* at 109-110, an electrician brought a negligence claim against an engineering company for injuries he sustained while working on an electrical panel that had not been clearly labeled "Danger High-Voltage." We concluded that

[11]The expert's affidavit, belatedly added to the summary judgment record, did not tender an opinion that the failure of Cambridge Seven and Cosentini (Design Team) to report these omissions to Hilton constituted professional malpractice. Rather, the expert merely declared that the Design Team failed to inspect the switchgear for compliance with the specifications, but the Design Team under the agreement was not required to make "exhaustive or continuous on-site inspections" to check the quality of work on the project. The Design Team's contractual breach was not its failure to inspect but its failure to report the signage deficiencies to Hilton after it received notice of the deficiencies from United Power and did not receive any shop drawings from Broadway correcting the problem. The expert's affidavit was silent as to whether the failure to report noncompliance with the two specifications to Hilton constituted a breach of the professional standard of care.

the judge erred in granting summary judgment to the defendant engineering company because there was documentary evidence in the record that, in performing its contractual duties, the defendant discovered or should have discovered that the distribution panel carried 2,300 volts and was not properly labeled, and either should have corrected this hazard or brought it to the attention of the owner of the plant. *Id.* at 115. Although the plaintiff had submitted an affidavit of an expert electrical engineer, we concluded that we could determine that summary judgment was granted in error without considering this expert opinion. *Id.* at 115 n.8.

We recognize that the engineering company's contractual duties in *Parent* were different from the architects' duties in this case. There, the contract designated the engineering company as the "project manager" for the project, with obligations to "furnish[] the necessary engineering and technical direction, . . . construction services, labor, materials, and equipment to complete this project," including participating and assisting in matters of safety. *Id.* at 114-115. Here, the agreement provided that Cambridge Seven was to provide services as an architect, not a project manager; it was specifically deemed not to have control over or any responsibility for construction means or methods, or for safety precautions and programs, and was expressly not responsible for any contractor's "failure to carry out Work in accordance with the Construction Contract." It provided only part-time representation on the site, where it was to determine, "in general, if Work is being performed in accordance with Construction Documents." Its obligation to "promptly inform Hilton in writing of any deficiencies in Work and/or deviations from the requirements of the Construction Contract" was limited to deficiencies and deviations "which come to [Cambridge Seven's] attention."

If the claim of negligence here were that the Design Team did not know, but should have known, of the deficiencies in the switchgear, we would conclude, given both the scope and the limitations of the Design Team's contractual responsibilities, that laymen could not reasonably infer without expert evidence that its failure to learn of the deficiencies constituted professional malpractice. But where, as here, there was evidence that

the Design Team actually knew of the deficiencies but failed to fulfil its contractual duty to report the deficiencies to Hilton, and where the deficiencies presented so obvious a risk to the safety of any person who would operate the switchgear, we agree with the Appeals Court in concluding that the evidence is sufficient without expert opinion to permit a finding of negligence. See *Parent, supra* at 115 n.8.

We disagree with the motion judge's finding that summary judgment must be granted as to causation because the Design Team had "no practicable means by which it could compel conformance by *any* party to meet its design specifications" (emphasis in original). The Design Team had the contractual duty to report deficiencies to Hilton and to prepare a "punch list" of all incomplete or unacceptable construction items that must be corrected before final completion of the project. We conclude that there is a genuine issue of material fact whether reporting the deficiencies to Hilton and refusing to declare the project completed until the deficiencies were corrected would have caused the mimic bus diagram and warning signage to be installed before LeBlanc was electrocuted.

Because the evidence in the summary judgment record is sufficient to support a finding that LeBlanc's death was caused by the professional negligence of the Design Team based on their failure to report known deficiencies to Hilton that posed a serious safety risk to anyone who operated the switchgear, the judge erred in granting summary judgment to the Design Team on the cross claims for contribution brought by Hilton and Broadway.

*2. Cross claim for contractual indemnification.* Although Hilton may prevail on its claim for contribution, it may not prevail on its claim of contractual indemnification against Cambridge Seven. Even if Cambridge Seven were negligent for failing to report Broadway's failure to install the mimic bus diagram and the warning signage on the switchgear, Hilton would still have no contractual right of indemnification against Cambridge Seven because, under § 9.4 of the agreement, its right of indemnification "shall not apply" where the losses "result from the negligent acts or omissions of . . . other parties for which [Cambridge Seven] is not responsible." Under § 2.1.9 of the agreement,

Cambridge Seven was not responsible for Broadway's "failure to carry out Work in accordance with the Construction Contract," and had no control over its acts or omissions. Where Hilton's claim of negligence rests on Cambridge Seven's failure to report Broadway's negligence in not correcting the deficiencies in the switchgear, any losses resulting from Cambridge Seven's negligence would also result from Broadway's negligence, a party "for whom [Cambridge Seven] is not responsible."

*Conclusion.* For the reasons stated, we conclude that the motion judge correctly granted summary judgment in favor of Cambridge Seven and Cosentini as to Hilton's and Broadway's cross claims for indemnification but erred in granting summary judgment as to the cross claims for contribution. We remand the case for trial as to the contribution claims.

*So ordered.*